**J. P. ACKER, Jr., Petitioner,**

v.

**M. M. GUINN, Respondent.**

**No. B–2097.**

Supreme Court of Texas.

Feb. 10, 1971.

I. Emphasis ours throughout.

Norman, Rounsaville, Hassell & Spiers, John B. Spiers, Jacksonville, for petitioner.

Gordon Wellborn and Rex Houston, Henderson, for respondent.

WALKER, Justice.

This is a declaratory judgment action brought by petitioner Acker against respondent Guinn and another. The question to be decided is whether an interest in the iron ore passed to the grantee under a deed executed in 1941 and purporting to convey "an undivided ½ interest in and to all of the oil, gas and other minerals in and under, and that may be produced from" a tract of 86½ acres in Cherokee County. Petitioner, who holds under the grantee, claims that the conveyance included an interest in the iron ore. Respondent, who holds under the grantor, insists that it did not. Both parties filed motions for summary judgment, and the trial court sustained petitioner's motion. The Court of Civil Appeals concluded that the deed conveyed no interest in the iron ore. It accordingly reversed the judgment of the trial court and rendered judgment in respondent's favor. 451 S.W.2d 549. We agree with the Court of Civil Appeals.

The Court of Civil Appeals reasoned that under our opinion in Southland Royalty Co. v. Pan American Petroleum Corp., Tex.Sup., 378 S.W.2d 50, the rule of ejusdem generis is properly used as an aid in determining the sense in which the term "other minerals" was used in the deed. According to the usual statement of this rule, the scope of general words following an enumeration of particulars is restricted

to things, within the description, of the same kind or nature as the particulars enumerated. There are a number of cases in which the rule was rejected or ignored in construing general words such as "other minerals" in a deed or lease. See Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800; Rio Bravo Oil Co. v. McEntire, 128 Tex. 124, 95 S.W.2d 381, 96 S.W.2d 1110; Cain v. Neumann, Tex.Civ.App., 316 S.W.2d 915 (no writ); Luse v. Boatman, Tex.Civ.App., 217 S.W. 1096 (wr. ref.).

The opinion in *Southland Royalty* states that the doctrine of ejusdem generis as applied to minerals has never been accepted in Texas. At another place in the same opinion it is said that the meaning of the term "other minerals" is determined by the specifically named minerals with which it is used, and this was regarded by the Court of Civil Appeals as simply a statement of the ejusdem generis rule. The question in *Southland Royalty* was whether gas produced and sold from the leased premises was governed by the clause in the lease providing for a royalty of "⅛ of the net proceeds of potash and other minerals at the mine." The term "other minerals" appeared at two other places in the lease, and in each instance it was preceded by the words "oil and gas, potash." In stating that the meaning of "other minerals" was determined by the specifically named minerals with which it was used, we were saying that the term as used in the different clauses of the lease obviously referred to something *other than* the specifically enumerated substances immediately preceding it. The ejusdem generis rule was not applied in *Southland Royalty,* and we do not use it here.

The form of the deed in the present case has been widely used in Texas for many years. Following the granting clause and the description of the land, it stipulates: (1) that the land is under an oil and gas lease; (2) that the sale is made subject to the lease but covers and includes one-half of all the oil royalty and gas rental or

royalty due and to be paid under the terms of the lease and one-half of the money rentals paid to extend the term within which a well may be begun under the lease; and (3) that in the event the lease becomes cancelled or forfeited, the grantee shall own one-half of all oil, gas and other minerals in and under the land together with a like interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the land.

The record shows that iron ore in commercial quantities is found extensively in Cherokee County and other areas in eastern Texas. It has a definite chemical composition expressed by the formula "$Fe_2O_3H_2O$." The ore has been used over the years as a foundation base in road construction. As pointed out by the Court of Civil Appeals, this is perhaps the principal use made of the material on a continuous basis. Its silica content is so high that it cannot be used alone for the manufacture of pig iron. It can be used for that purpose when mixed with other ores. The ore is also used in the manufacture of cement.

At different times there has been commercial production of pig iron from the ore. Two blast furnaces produced pig iron in Cherokee County during the Civil War. Another was operated by the convicts at Rusk State Penitentiary from 1883 to 1909. Two other furnaces were located in Cherokee County, one of which was in operation between 1890 and 1896 and the other for about a year in 1907. During World War II and for several years thereafter, Sheffield Steel Company operated a plant in Cherokee County where the ore was crushed and washed before being shipped to Houston for making pig iron. A blast furnace was constructed by Lone Star Steel Company near Daingerfield during World War II and the furnace has been used "most of the time since its construction" to make pig iron from East Texas ore.

The ore deposits are solid beds varying in thickness from a few inches to three or

four feet. These deposits conform generally to the contour of the earth's surface. They outcrop on the surface at places and range in depth to as much as fifty feet below the surface. The ore must be mined by a process known as the open-pit or strip-mining method. The soil and other materials overlying the ore are first removed by bulldozing, and the ore is then dug out with power shovels. This means that the surface owner could make practically no beneficial use of his land where the mining operations are in progress. Although the surface can be levelled after the operation is completed, the surface soil is usually turned under in the process. The utility of the land for farming, ranching and timber production is thus destroyed or diminished to a substantial degree.

It is clear then that the ore is a mineral with commercial value, but its production will destroy the surface over large areas wherever the deposits are mined. The question of whether a grant or reservation of "minerals" includes minerals that are recoverable only by open-pit mining has been considered by the courts of a number of jurisdictions. In most instances they have attempted to ascertain whether the parties intended to include or exclude the particular substance in question. Various approaches and rules of construction have been used to determine this intention, and the holdings are not uniform. See Annotations, 1 A.L.R.2d 787, 95 A.L.R.2d 843.

For example, it was held in Hext v. Gill (1872, Eng.), L.R. 7 Ch. 699, 17 E.R.C. 429, that while a bed of china clay extracted by open workings was included in a reservation of "mines and minerals," the owner of the surface was entitled to an injunction to prevent the owner of the minerals from destroying or seriously injuring the surface. Another court concluded that a grant of "coal and other minerals, except oil and gas" did not include clay valuable for the manufacture of brick. It reasoned that certain language in the deed indicated that the parties contemplated the production of minerals only by the ordinary process of shafting and tunneling. Rock House Fork Land Co. v. Raleigh Brick & Tile Co., 83 W.Va. 20, 97 S.E. 684. In holding that a devise of "mineral rights" did not include commercial limestone and building stone, we emphasized that these substances are not minerals in the ordinary and natural meaning of the term and that their production by the open-pit method would destroy the surface for agricultural and grazing purposes. Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994. Despite the suggestion to the contrary in *Heinatz,* it was later held that "oil, gas and other minerals" did not include limestone that could be used to manufacture cement. Atwood v. Rodman, Tex.Civ.App., 355 S.W.2d 206 (wr. ref. n. r. e.).

The Supreme Court of Arkansas held that bauxite was not included in an 1892 reservation of "all coal and mineral deposits," because: (1) bauxite is a clay formation containing alumina in small particles; (2) its existence was not known at the time the instrument was executed; and (3) the mining of bauxite is generally by the open-pit method, which would destroy the value of the surface. Carson v. Missouri Pac. R. Co., 212 Ark. 963, 209 S.W. 2d 97. Considerations of this nature were regarded as unimportant by the Federal District Court in New Mexico when it held that uranium and thorium were included in a reservation of "all oil, gas and minerals underlying or appurtenant to said land." The court reasoned that uranium and thorium, being minerals within the scientific, geological and practical meanings of the term, would certainly constitute minerals within the purview of the reservation. New Mexico and Arizona Land Co. v. Elkins, D.C.N.M., 137 F.Supp. 767. There is a Texas decision holding that uranium was covered by an instrument leasing "all of the oil, gas, coal and other minerals" and providing for a royalty on unnamed minerals. Cain v. Neumann, Tex.Civ.App., 316 S.W.2d 915 (no writ). As pointed out in the opinion, however, the question was not briefed by the appellees,

who were contending that the lease did not cover uranium, and it does not appear that the case involved any question of open-pit mining. The court did consider and reject the usual arguments that uranium was excluded by the ejusdem generis rule and because it was unknown when the lease was executed.

At least one writer has suggested that the courts have mistakenly attempted to discover and give effect to an intention to include or exclude a specific substance from the grant or reservation. He points out that:

"The contradiction and conflict between the cases on the point arise from the very fact that the courts are seeking to give effect to an *intention* to include or exclude a *specific substance,* when, as a matter of fact, the parties had nothing specific in mind on the matter at all. It is submitted that an intention test is the proper one, but not as applied heretofore. The intention sought should be the *general intent* rather than any supposed but unexpressed *specific intent,* and, further, that general intent should be arrived at, not by defining and redefining the terms used, but by considering the *purposes* of the grant or reservation in terms of manner of enjoyment intended in the ensuing interests.

"When a general grant or reservation is made of all minerals without qualifying language, it should be reasonably assumed that the parties intended to sever the entire mineral estate from the surface estate, leaving the owner of each with definite incidents of ownership enjoyable in distinctly different manners. The manner of enjoyment of the mineral estate is through extraction of valuable substances, and the enjoyment of the surface is through retention of such substances as are necessary for the use of the surface, and these respective modes of enjoyment must be considered in arriving at the proper subject matter for each estate." Kuntz, The Law Relating to Oil and Gas in Wyoming, 3 Wyo.L.J. 107, 112. See also 12 O & GR 681.

In our opinion the basic approach there suggested is entirely sound. A grant or reservation of minerals by the fee owner effects a horizontal severance and the creation of two separate and distinct estates: an estate in the surface and an estate in the minerals. See Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717; Walker, Fee Simple Ownership of Oil and Gas in Texas, 6 Tex.L.Rev. 125. The parties to a mineral lease or deed usually think of the mineral estate as including valuable substances that are removed from the ground by means of wells or mine shafts.[1] This estate is dominant, of course, and its owner is entitled to make reasonable use of the surface for the production of his minerals. It is not ordinarily contemplated, however, that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired. Unless the contrary intention is affirmatively and fairly expressed, therefore, a grant or reservation of "minerals" or "mineral rights" should not be construed to include a substance that must be removed by methods that will, in effect, consume or deplete the surface estate. See Clark, Uranium Problems, 18 Tex.B.J. 505.

That is the rule to be applied in determining whether an interest in the iron ore was conveyed by the deed in this case. In terms of its location with respect to the surface, methods by which it must be mined, and the effect of production upon the surface, the ore is quite similar to gravel and limestone. Aside from the general reference to "other min-

---

1. It has been suggested that hard-mineral mining conducted by the sinking of shafts or tunnels may also require destruction of the surface through the deposit of waste and debris removed to gain access to the ore, but that question will be considered when it arises. See Clark, Uranium Problems, 18 Tex.B.J. 505.

erals," moreover, there is nothing in the deed even remotely suggesting an intention to vest in the grantee the right to destroy the surface. It is our opinion that in these circumstances the ore, like gravel and limestone, should be considered as belonging to the surface estate and not as part of the minerals. We accordingly hold that as a matter of law no interest in the ore passed by the deed.

The judgment of the Court of Civil Appeals is affirmed.