**HUMBLE OIL AND REFINING COM-
PANY, Petitioner,**

v.

**Wesley WEST et al., Respondents.**

No. B–4132.

Supreme Court of Texas.

April 24, 1974.

Rehearing Denied June 5, 1974.

McGinnis, Lochridge & Kilgore, Robert C. McGinnis, Austin, Walter B. Morgan, Dillard W. Baker, Talbert J. Fox and J. Lamar Hart, Houston, for petitioner.

Stayton, Maloney, Black, Hearne & Babb, John W. Stayton, Austin, for respondents.

STEAKLEY, Justice.

This is a suit by West, et al., Respondents, who are royalty owners, for injunction and, in the alternative, for declaratory judgment. The action is brought against Humble Oil and Refining Company, Petitioner, the fee owner of the gas field and mineral rights, subject to the royalty interests. The problem arises from Humble's action of injecting extraneous gas into the underground reservoir, for purposes of storage, prior to production of all the recoverable native gas. The history of the matter will be recited in some detail.

The Wests, by fee simple conveyance dated December 28, 1938, deeded all lands owned by them in the West Clear Lake (Frio) gas field in Harris County, Texas, to Humble. Each conveyance recited that the Wests "except from this conveyance and retain unto themselves, their heirs, successors and assigns, those certain royalties on oil, gas and other minerals which may be produced and saved from the lands hereby conveyed." Insofar as gas is concerned, the retained royalty was described as "a royalty equal to the market value at the well of one-sixth ($\frac{1}{6}$) of the dry gas so sold or used; provided that on such dry gas sold at the wells the royalties shall be one-sixth ($\frac{1}{6}$) of the amount realized from such sale."

The West Clear Lake Field, a water drive field, has been producing gas since 1938. In 1969, Humble concluded that the reservoir was approaching depletion and that the injection of extraneous gas was necessary to preserve the reservoir from destruction by water encroachment. In response to Humble's application, and after a hearing on September 23, 1969, at which the Wests appeared in opposition, the Railroad Commission of Texas, under date of January 20, 1970, authorized use of the reservoir for the storage of gas. There was no appeal from this order.

On March 26, 1970, the Wests instituted this suit against Humble for permanent injunction, i. e., "that upon final trial hereof defendant be enjoined from using the Clear Lake, W. (Frio) Field, Harris County, Texas, as a gas storage reservoir until all the native gas therein has been produced." In the alternative, the Wests sought a "declaratory judgment decreeing that if defendant uses said reservoir as a gas storage reservoir, defendant must account to plaintiffs for their royalty inter-

ests in all gas produced from said reservoir irrespective of whether said produced gas be native gas or stored gas."

Humble commenced the injection of extraneous gas on September 1, 1970. In response to the Wests' suit, Humble's first amended answer, filed June 2, 1972, alleged that before commencement of the gas storage project, it had produced 89% of the recoverable gas reserves in the reservoir and that production of the remaining recoverable gas would have resulted in destruction of the reservoir's gas storage capability. Further, in answer, Humble committed itself to continue to pay royalties on production from the reservoir "until, but only until, the total volume of all gas so produced from the particular tract is equal to the volume of gas in place in the reservoir in such tract above the gas-water contact as of January 1, 1969, terminating all royalty payments as to such tract in such reservoir when such production has occurred."

Under date of September 18, 1972, and after a trial before the Court, judgment was entered denying the prayer of the Wests for permanent injunction but decreeing "[t]hat defendant must account to plaintiffs for their royalty interests in all gas produced from the tracts in which they own royalty interests in the Clear Lake W. (Frio) Field, Harris County, Texas, irrespective of whether said produced gas be native gas or stored gas."

Upon appeal by all parties, the Court of Civil Appeals reversed the judgment of the trial court and remanded the cause, with instructions "to enter a permanent injunction restraining defendant from further injecting the field and using same as a gas storage reservoir until all native gas has been produced therefrom." 496 S.W.2d 212. Writ of error was granted at the instance of Humble. We reverse and remand.

The initial and underlying problem to be solved is whether, under the contract between the parties and the existing circum-

stances, the Wests are entitled to enjoin Humble from injecting gas in the reservoir until all recoverable native gas has been produced. If not, we must then determine the rights of the parties under the Wests' alternative prayer that Humble account to them in royalty payments on all gas produced from the reservoir, whether native or stored.

As to the first issue, the Wests argue that prior writings of this Court establish principles which entitle them to injunctive relief. They cite Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021 (1934), where this Court determined that in the context of property taxation, a royalty interest, whether payable in money or in kind, should be denominated an interest in land. See also Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943); Watkins v. Slaughter, 144 Tex. 179, 189 S.W.2d 699 (1945). They emphasize that one in the position of Humble is required not only to produce and market gas from the tract found in paying quantities, W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27 (1929); Knight v. Chicago Corp., 144 Tex. 98, 188 S.W.2d 564 (1945), but also to accurately measure such production and sales in order to accurately account to the royalty owner. French v. George, 159 S.W.2d 566 (Tex.Civ.App.—Amarillo 1942, writ ref'd); Brown v. Smith, supra. Thus, the Wests contend that the proprietary and contractual rights arising from their royalty interest translate into certain absolute rights in the native gas now in the reservoir, under which they are entitled to total production of all native gas prior to utilization of the reservoir for storage of extraneous gas. Otherwise stated, it is their position that the nature of their royalty interest, coupled with their right to royalties on all native gas produced at market demand and sold at prevailing market prices, precludes any right in Humble to commingle gas in the reservoir, and that Humble's actions so impaired the rights of the Wests as to entitle them to enjoin further commingling. Additionally, they argue by analogy the applicability of the

principle of awarding injunctive relief when one intentionally appropriates another's property interest by encroachment, Bickler v. Bickler, 403 S.W.2d 354 (Tex. 1966), or when one is acting in violation of building restrictions. Welton v. 40 East Oak Street Building Corp., 70 F.2d 377 (7th Cir. 1934) cert. denied 293 U.S. 590, 55 S.Ct. 105, 79 L.Ed. 685 (1934).

■ The nature of the respective property interests of the parties should first be noted. As stated, the Wests conveyed fee title to the lands but reserved "royalties on oil, gas and other minerals which may be produced and saved from the lands hereby conveyed," payable in money. Humble, on the other hand, owns the lands in fee simple, and this includes not only the surface and mineral estates, but also the matrix of the underlying earth, i. e., the reservoir storage space, subject only to the reserved right of the Wests to the payment of royalties on minerals that are produced and saved. See Emeny v. United States, 412 F.2d 1319, 188 Ct.Cl. 1024 (1969), where it was said that the surface of the leased lands remaining as the property of the respective landowners included the geological structures beneath the surface, together with any such structure that might be suitable for the underground storage of extraneous gas produced elsewhere. Indeed, the Wests do not challenge Humble's ownership of the reservoir and its right to utilize it for storage; instead, they direct their argument to the time at which, they say, the storage right accrues. They argue, in essence, that the exercise of such right by Humble is postponed by the royalty reservation until total depletion of all recoverable native gas from the reservoir.

■ It is manifest that the interests of the parties have come into conflict and are not fully compatible. Thus, we have again the recurring problem of adjusting correlative rights. The factual context is unique and there is no directly controlling precedent; however, this Court has led the way in conciliating conflicts between own-

ers of the surface and of the mineral rights, and in requiring reasonable accommodations between them. See Robinson v. Robbins Petroleum Corp., 501 S.W.2d 865 (Tex.1973); Sun Oil Co. v. Whitaker, 483 S.W.2d 808 (Tex.1972); Acker v. Guinn, 464 S.W.2d 348 (Tex.1971); Getty Oil Co. v. Jones, 470 S.W.2d 618 (Tex.1971); Humble Oil & Refining Co. v. Williams, 420 S.W.2d 133 (Tex.1967); Railroad Commission v. Manziel, 361 S.W.2d 560 (Tex.1962); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961); Warren Petroleum Corp. v. Monzingo, 157 Tex. 479, 304 S.W.2d 362 (1957); Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954). These writings and the principles which they establish are instructive here.

In Acker v. Guinn, supra, we affirmed that it is not ordinarily contemplated in mineral leases or deeds that the utility of the surface will be destroyed or substantially impaired by the uses made of the surface for the production of minerals.

In Getty Oil Co. v. Jones, supra, a dispute arose between the surface owner and the oil and gas lessee over rights to exclusive use of air space above the surface area occupied by oil pumping units required for production of the minerals. This Court was faced with seemingly irreconcilable positions; the surface owner was unable to operate his automatic irrigation sprinkler system, and hence unable to fully utilize his surface rights because of obstacles in the form of the lessee's existing pumping units. In addressing the conflict between the parties, we recognized the well settled principle that the oil and gas estate is dominant over the surface estate; further, that the lessee has a right to use as much of the premises as necessary to produce and remove the minerals. However, we also reiterated that while the rights accruing from the dominant estate are well established, they are not absolute. The lessee is required to exercise his rights with due regard for the rights of the surface owner; and we held that the lessee

was subject to the rules of reasonable usage with respect to an existing use of the surface. Thus, the factual context, coupled with the public policy of developing resources and promoting productive agricultural use, required an accommodation between the rights of the dominant and servient estates.

A further example of the balancing of competing interests in the oil and gas context is found in Railroad Commission v. Manziel, *supra*. Here, this Court was faced with a question of whether an enjoinable "trespass" occurred when an adjoining mineral estate was invaded by salt water injected pursuant to secondary recovery projects authorized by the Railroad Commission. While the issue arose in the context of the validity of the Railroad Commission order, we emphasized that application of orthodox rules and principles may not be appropriate under such circumstances; we spoke of balancing the interests of society and the interests of the oil and gas industry as a whole against the interest of the individual operator.

In Woodson Oil Co. v. Pruett, 298 S.W. 2d 856 (Tex.Civ.App.—San Antonio 1957, writ ref'd n. r. e.), a lease was lost as the result of non-production. The lease specifically provided that Woodson had the right to remove all property and fixtures, including the casing, and Woodson sought an injunction to enforce this contractual right against a producing well. While fully recognizing Woodson's explicit rights under the lease, the court determined that the destruction of the well and the waste of natural resources which would result from such removal were sufficient reason to deny the equitable relief.

■ In the case at hand, the interests of the parties are evident; the Wests possess a royalty interest in native gas produced from the West Clear Lake Field, while Humble owns fee title to the lands, including the subsurface reservoir. In conciliating the interests asserted by each party, we must necessarily consider the unusual nature of the subsurface reservoir and the West Clear Lake gas fields. The unique geologic and geographic characteristics of the reservoir are shown by the record; further, the evidence establishes that since this reservoir lies in a water drive field, salt water encroachment reduces the storage capability as native gas is produced. Absent injection of extraneous gas, production of native gas to depletion will result in a "watering out" or total destruction of the storage capability of the reservoir. As a consequence, injunction against the injection of extraneous gas would render illusory Humble's ownership of the storage rights in the reservoir.

Moreover, our ruling will determine the continued existence of an important natural resource. The record reveals two significant features of the reservoir which vitally affect the public interest. First, the reservoir is well-suited as a "peaking" facility which can handle the seasonal fluctuations and rapidly increasing energy demands for the greater Houston area; secondly, it is a strategically located "emergency" facility, capable of providing a readily deliverable supply of gas at times when accidents, natural disasters or mechanical failures make continued delivery through normal channels impossible.

Under these circumstances, the accepted principles of accommodation that have ruled the resolution of like conflicts are determinative, and we hold that the Court of Civil Appeals erred in ordering the injunctive relief sought by the Wests.

The denial of injunctive relief requires a determination of whether the contractual obligation of Humble is to account in royalties on the production of all gas from the reservoir, "irrespective of whether said produced gas be native or stored gas," as decreed by the trial court.

The Wests argue that this "pay forever" judgment is compelled by the language of the original conveyance. The conveyance stated that the Wests "except from this conveyance and retain unto themselves.

their heirs, successors and assigns, those certain royalties on oil, gas and other minerals which may be produced and saved from the lands hereby conveyed." Thus, the Wests claim that while Humble may be permitted to inject extraneous gas for storage purposes, *all* gas produced and saved from the lands is subject to the Wests' royalty interest. The original conveyance made no distinction between native gas and extraneous or stored gas, and the Wests contend that to hold that Humble is not under obligation to pay royalties on the stored gas "produced and saved" would require a rewriting of the existing instruments of conveyance.

To date, the only Texas case dealing with the issue of ownership of gas stored in a natural reservoir is Lone Star Gas Co. v. Murchison, 353 S.W.2d 870 (Tex.Civ. App.—Dallas 1962, writ ref'd n. r. e.). Lone Star Gas, by various conveyances, acquired wells and leases in the Bacon Lime Field; Lone Star Gas also executed a unit operating agreement by which it acquired the right to inject and store extraneous gas in the Bacon storage reservoir. The Murchison group possessed rights as oil and gas lessees on the Jackson tract, and the southwestern part of the Bacon storage reservoir extended under the Jackson tract. The Murchisons drilled a well into the Bacon storage reservoir and took large quantities of gas therefrom. The question was whether the title and ownership of extraneous gas which Lone Star injected into the reservoir for storage was lost upon production of the commingled gas. The Murchisons urged the court to adopt the reasoning of Hammonds v. Central Kentucky Natural Gas Company, 255 Ky. 685, 75 S.W.2d 204 (1934); when faced with a similar fact situation, the Kentucky court determined that the doctrine of animals ferae naturae was applicable. Thus, once extraneous gas which was "turned loose" in the earth wandered to another's land, the party injecting the stored gas ceased to be the exclusive owner of gas; the gas became a mineral ferae naturae.

■ The Court of Civil Appeals in *Murchison* rejected the doctrine established in *Hammonds* and embraced the language of White v. New York State Natural Gas Corp. et al, 190 F.Supp. 342 (W.D.Pa. 1960), where it was stated that "once severed from the realty, gas and oil, like other minerals, become personal property . . . title to natural gas once having been reduced to possession is not lost by the injection of such gas into a natural reservoir for storage purposes." Therefore, under *Murchison,* the extraneous gas injected for storage by Humble having assumed the character of personal property, remained its property. *See* also Chaffin v. Hall, 210 S.W.2d 191 (Tex.Civ.App.—Eastland 1948, writ ref'd n. r. e.); Stephens v. Stephens, 292 S.W. 290 (Tex.Civ.App.— Amarillo 1927, writ dism'd).

■ The Wests assert, however, that since they possess a perpetual royalty on the gas produced from the field, their royalty interest "expires with the end of time." Thus, they argue that the contractual relationship of the parties, i. e., the obligation to pay royalty on all gas produced and saved, becomes the controlling distinction between the instant case and *Murchison.* In our view, this is not a tenable distinction but one which if adopted would implicitly recognize the doctrine of minerals ferae naturae which was rejected in *Murchison.* In accord with *Murchison,* Humble's ownership of the gas as personal property is not altered either upon injection of the gas into the reservoir or upon later production of the gas. The language of the conveyance does no more than reserve the royalty interest in the native gas in the reservoir, and Humble's ownership of the extraneous gas is unaffected thereby.

An alternative basis to be considered is whether the trial court judgment may be sustained on a confusion of goods theory. Under *Murchison,* as noted, the extraneous gas is the personal property of Humble. However, by injecting this extraneous gas

into the reservoir prior to production of all native gas, Humble has commingled extraneous gas, in which Humble has an exclusive property interest, and native gas, in which the Wests have a royalty interest. The question thus becomes one of determining whether Humble's intentional "confusion" of the two bodies of gas should result in the forfeiture of its exclusive rights to the extraneous gas. If such a forfeiture is proper, the Wests would be entitled to a royalty on all gas produced, consistent with the trial court judgment.

As a general rule, the confusion of goods theory attaches only when the commingled goods of different parties are so confused that the property of each cannot be distinguished. Where the mixture is homogeneous, the goods being similar in nature and value, and if the portion of each may be properly shown, each party may claim his aliquot share of the mass. Belcher v. Cassidy Bros. Live Stock Commission Co., 26 Tex.Civ.App. 60, 62 S.W. 924 (Tex.Civ.App.—1901, writ ref'd); Farrow v. Farrow, 238 S.W.2d 255 (Tex. Civ.App.—Austin 1951, no writ); 1 Am. Jur.2d Accession and Confusion, § 21 (1962); 15A C.J.S. Confusion of Goods § 7 (1967). Additionally, the burden is on the one commingling the goods to properly identify the aliquot share of each owner; thus, if goods are so confused as to render the mixture incapable of proper division according to the pre-existing rights of the parties, the loss must fall on the one who occasioned the mixture. 15A C.J.S. Confusion of Goods §§ 7, 12 (1967); 1 Am.Jur. 2d Accession and Confusion, §§ 18, 24 (1962). Stated differently, since Humble is responsible for, and is possessed with peculiar knowledge of the gas injection, it is under the burden of establishing the aliquot shares with reasonable certainty. See Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493 (1943); Cf. Mooers v. Richardson Petroleum Co., 146 Tex. 174, 204 S.W.2d 606 (1947); Ortiz Oil Co. v. Luttes, 141 S.W. 2d 1050 (Tex.Civ.App.—1940, writ dism'd); 1 W. Summers, The Law of Oil and Gas § 27 (1954).

Humble sought to discharge this burden by offering expert opinion evidence in estimation of the volume of native gas as of January 1, 1969; its commitment in the trial court was to continue the payment of royalties to the Wests on the basis of this proof until production of the commingled gas equaled the volume of the gas in place at such time. As to this, the Wests contend that the obligation of Humble to account for their royalty interests may not rest upon expert opinion evidence and that, at the least, upon its election to utilize the reservoir for storage and hence to commingle native and extraneous gas, Humble came under the obligation of paying royalties on all gas thereafter produced from the reservoir.

The counter position of Humble is that the opinion testimony of the geology and engineering witnesses is reasonably certain; that their testimony was based upon more than acceptable well control for mapping the reservoir, and that there existed sufficient data upon which to compute reservoir pressure, reservoir temperature, gas formation volume factor, reservoir porosity and permeability and connate water saturation. Thus, Humble asserts that the Wests' aliquot share of the gas in the reservoir prior to injection of the extraneous gas is subject to a reasonable estimate and that the expert testimony sufficiently established the volume of the reserves.

In the context of their asserted right to equitable relief, the Wests emphasize, on the other hand, that Warnack, Humble's geologist witness, admitted that a certain "judgment or opinion decision" had to be made in calculating the reservoir size. They stress that the witness acknowledged that wide discrepancies may exist in determining the size of a reservoir and insist that his calculations were based upon limited and unacceptable information. Also, they note that Whitson, the petroleum engineer called to testify by Humble, made critical calculations of porosity and permeability by means of mathematical averages; further, that experts agree that the limits of a reservoir are difficult of exact determination.

As we have indicated, it is our view that the act of commingling native and extraneous gas did not impose upon Humble the obligation of paying royalties on all gas thereafter produced from the reservoir, if the evidence establishes with reasonable certainty the volume of gas reserves upon which the Wests would have been entitled to royalties, absent injection of extraneous gas. The burden of this showing devolves upon Humble after proof by the Wests of their royalty interests, together with proof of Humble's commingling of extraneous and native gas. The threshold question for determination is whether the requisite computation of reserves is capable of establishment with reasonable certainty; and, if so, the further question to be resolved is whether the burden defined above is discharged by Humble under the evidence. We have concluded that the cause should be generally remanded to the trial court for determination of these issues at the trial level, as well as for consideration of any other issues the parties may raise in the light of our rulings.

The judgment of the Court of Civil Appeals is reversed and the cause remanded to the trial court for further proceedings in accordance with this opinion.