Bette REED, Trustee, a Co-Partnership,
Petitioner,

v.

W. C. WYLIE et ux., Respondents.

No. B–8477.

Supreme Court of Texas.

March 19, 1980.

Hugh D. Reed, Jr., Fairfield, James W. Bradford, Jr., Angleton, James W. McCartney and Ben H. Rice, Houston, for petitioner.

Strasburger & Price, Leo J. Hoffman, Dallas, Life & Bolding, Jack T. Life, Athens, for respondents.

GREENHILL, Chief Justice.

A conveyance of the land in question reserved an interest in oil, gas and other minerals. The first question is whether that reservation included an interest in lignite. Upon the first appeal of this case, the record contained no facts as to the depth of the lignite. The cause was remanded for a new trial to ascertain those facts. 554 S.W.2d 169. We now have them. Our holding is that the trial court correctly held that as a matter of law, lignite was "at the surface" of the land, was part of the surface estate, and was not reserved by the grantor as "oil, gas and other minerals."

After our first remand of the cause, the grantors in the instrument in question, pleaded facts regarding a mutual mistake of the parties to the instrument; and they prayed for a reformation of the instrument.

Upon the second trial, after a development of the facts as set out below, the trial court entered a summary judgment which held (1) that as a matter of law, the lignite was "at the surface" and was not reserved as a mineral, and (2) that as a matter of law, the grantors were not entitled to reformation.

The court of civil appeals reversed that judgment on both grounds. 579 S.W.2d 329. There is but one *judgment* of the court of civil appeals, and that was that the judgment of the trial court be reversed and the cause remanded for a new trial.

We agree with the *judgment* of the court of civil appeals because we are of the opinion that it was error to render summary judgment on the issue of reformation. We disagree with the holding and the opinion of that court (as opposed to its judgment) on the ownership of the lignite if the deed is not reformed.

## OWNERSHIP OF THE LIGNITE

Our holding as to the lignite is based on two opinions of this court. The first is *Acker v. Guinn*, 464 S.W.2d 348 (Tex.1971), a unanimous decision. *Acker* was expressly affirmed by our first opinion in this case, *Reed v. Wylie*, 554 S.W.2d 169 (Tex.1977), a divided opinion.

In *Acker*, the reservation was also of oil, gas and other minerals. The question was whether surface and near surface iron ore was reserved as a mineral. The record in *Acker* was that iron ore was found "extensively in Cherokee County and other areas in eastern Texas." "The ore deposits are

solid beds varying in thickness from a few inches to three or four feet. These deposits conform generally to the contour of the earth's surface. They outcrop on the surface at places and range in depth to as much as fifty feet below the surface. The ore must be mined by a process known as the open-pit or strip-mining method." 464 S.W.2d at 350–351. "In terms of its location with respect to the surface, methods by which it must be mined, and the effect of production upon the surface, the ore is quite similar to gravel and limestone." *Id.* at 352.

Without referring to an outcropping on the particular tract in question, we held that, as a matter of law, the iron was not intended to be reserved as a mineral. The intent of the parties to the grant and reservation was held to be a *general* intent and not a specific intent. Unless specifically referred to, a person granting or reserving an interest in "oil, gas and other minerals" by lease or other conveyance would not generally have intended that his surface be destroyed in order for the grantee to recover the unnamed minerals.

Our first opinion in *Reed v. Wylie*, after reviewing and affirming *Acker*, had two holdings relevant here. They may be summarized:

1. "[t]he surface estate owner must prove that, as of the date of the instrument being construed, if the substance near the surface had been extracted, that extraction would have consumed or depleted the land surface."

2. On the other hand, "if lignite lies at the surface of the land, no further proof would be required to establish the title of Reed [the surface owner] to the lignite . . . . ."

The problem then is, what did we mean by "at the surface of the land"?

It is undisputed that the surface of the land in question has already been completely strip mined.

The facts and circumstances of this case began before the execution of the instrument in question. In 1949, Wylie et al., at a time when they owned the surface and three-fourths of the mineral estate, executed a lease to others expressly granting the right to the lessees to extract coal and lignite from the land in question by strip mining. It was recognized that at least part of the surface would be destroyed, and the Wylies were to be paid $50.00 per acre for the portion of the land destroyed or rendered useless.

In 1950, after the above strip mining lease, the Wylies conveyed the subject tract to the predecessors in title of Reed by the instrument in question. As stated, it conveyed the land in question but reserved to the Wylies an undivided interest in "all oil, gas and other minerals." So at least the Wylies, having executed the strip mining lease in 1949, contemplated that the lignite would be strip mined.

As to whether the lignite was "at the surface," the facts are these: there are affidavits that persons in the area had been on the land, and farmed and hunted the land; and they never had seen any lignite on the surface of the land.

Lignite "outcrops" on the surface at one part of the land in question, we will call the Reed tract, in the bed of a gully or ravine. It also outcrops at many points in the same county. One outcrop is within a half mile of the Reed tract, and another within two miles of the Reed tract.

There is testimony that as lignite "comes toward the surface," the exposure or moisture causes lignite to "oxidize" or to deteriorate in quality. The low grade lignite becomes "smut" or "clinker." The smut or clinker is not of sufficient value to be mined because of its low BTU content and its higher ash content.

The testimony is that it would be very unusual to see the hard lignite at the top of the surface because of the "oxidizing" process.

On the Reed tract, the smut or clinker begins at about seven or eight feet from the top of the surface. The hard lignite begins at twenty to twenty-two feet in one vein, and runs almost parallel to the top of the

surface. A second vein of hard lignite on the Reed tract begins at about twenty feet and extends to a depth of eighty feet.

While there is testimony that lignite is presently stripmined in the area, there is also testimony that many years ago, lignite was mined in Texas by underground mining, using the room and pillar method; and there is evidence that this lignite could have been mined by that method.

The test laid out in our first *Reed v. Wylie* opinion, that the person claiming lignite as part of the surface estate must prove that near surface lignite *must* have been recovered by strip mining methods, does not apply, however, if the lignite lies at the surface of the land. What did the opinion mean by "at the surface of the land"?

The Wylies contend that the surface means the top of the ground. The Reeds contend that "the surface" means more than that,—that there is some depth to the surface of the earth.

The experts used the terms "outcrop" and "subcrop." The Wylies' expert, Lamb, stated in his affidavit without contradiction that "an outcrop occurs when the lignite seam is at the surface or is only obscured by soil from a high level such as a bank with a shallow cover of 3 or 4 feet." "A subcrop occurs when the land is well below the surface . . . at a depth of 5 feet or greater."

The word "surface" has so many definitions in various cases that it is incapable of an exact definition. *Websters New International Dictionary*, 2nd edition, unabridged, has a definition of surface as "(3) mining—working or worked at or near the surface."

■ So the question is not what some other case said, or even what this dictionary says, but what this court meant by "at the surface." The court did not say "outcropped at the surface," or "on top of the surface," but "at the surface." By that we did not mean only on the top of the surface, as one would find an object on the surface.

The opinion used the word surface as having some depth,—a depth shallow enough that it must have been contemplated that its removal would be by a surface destructive method.

■ In our opinion, the above summary judgment evidence constitutes proof, as a matter of law, that lignite was at the surface.

The fact that persons did not see lignite on the land as they walked upon it, therefore, does not conflict with a holding that lignite was at the surface.

We hold that the lignite, described in the summary judgment proof, was at the surface as a matter of law. Therefore, under the instrument in question, it was owned by Reed, the owner of the surface estate.

### THE LANGUAGE OF *REED V. WYLIE* REEXAMINED

As noted above, a dispositive sentence in our first opinion in *Reed v. Wylie* regarding near surface deposits stated:

> . . . the surface estate owner must prove that, as of the date of the instrument being construed, if the substance near the surface had been extracted, that extraction would necessarily have consumed or depleted the land surface.

554 S.W.2d at 172.

This was construed by the concurring and dissenting opinions to the first *Reed* opinion,[1] and by the court of civil appeals upon this appeal, to mean that the movant for summary judgment must prove that the *only* method of removal of the lignite was by surface destructive methods.

Our first opinion in *Reed* also strongly states that "we reaffirm the holding and the writing in *Acker v. Guinn*." The problem here involved was not before the court in *Acker*. The undisputed facts in *Acker* were that the iron deposits in the vicinity of the land in question "*must* be mined by a process known as the open-pit or strip-mining method. The soil and other materials overlying the ore are first removed by bull-

---

1. 554 S.W.2d at 173 and 174.

dozing, and the ore is then dug out with power shovels." 464 S.W.2d at 351 (emphasis here added).

Since the undisputed facts were that the iron deposits in *Acker* must have been removed by open pit or strip mining methods, the opinion was written to address those facts.

The opinion in *Acker* also referred to a law review article by Dean Eugene Kuntz, noting that it was "entirely sound," which says, regarding the *general* intent of the parties to the grant or retention of minerals:

> The manner of enjoyment of the mineral estate is through extraction of valuable substances, and the enjoyment of the surface is through retention of such substances as are necessary for the use of the surface, and these respective modes of enjoyment must be considered in arriving at the proper subject matter for each estate. 464 S.W.2d at 352.

The thrust of *Acker* is not addressed to the word "must,"—an agreed fact, but the surface-destructive method of removal of the deposit: " . . . there is nothing in the deed even remotely suggesting an intention to vest in the grantee the right to destroy the surface." 464 S.W.2d at 353.

■ The rule for near surface lignite, iron or coal, therefore, is that if the deposit lies near the surface, the substance will not be granted or retained as a mineral if it is shown that any reasonable method of production would destroy or deplete the surface. As we read *Acker*, and as stated in the concurring opinion in *Reed*, and as stated in the dissent in *Reed*, the controlling factor is the close physical relationship of the substance to the surface itself. 554 S.W.2d at 181. That portion of *Reed* which would require that the near surface substance "must" be removed by surface destructive methods is overruled.

Second, the first opinion in *Reed* holds that since the general intent of the parties is to be determined by the instrument executed, the lignite must have been strip mined *as of the date of the instrument.* That created a fact question as to the state of the art of removal of the substance upon some particular date in the past. The older the instrument, the more difficult the proof would be. The parties would have to employ an expert, or experts, who could testify as to the state of the art as of the date of the execution of the instrument. It might result in the ownership of the substance on adjacent tracts being different depending upon the testimony of experts as to the state of the art at the date of the instrument. This rule had, and would have, a very unstabilizing effect upon land titles.

*Acker* made no such requirement. After an introductory paragraph setting out the instrument and the date of its execution in 1941, the opinion nowhere says that there must have been proof of surface destructive methods of removal in 1941. Instead, the opinion repeatedly used the present tense. The agreed fact was that the substance must *be* strip mined, and "*are* recoverable . . . ." [2]

As pointed out in the dissent in *Reed*, the general intent of the parties was not that the surface not be destroyed only in 1941, but thereafter as well. 554 S.W.2d at 181–182.

■ So, as above, we return to *Acker*. That part of the *Reed* opinion which required a fact finding that the surface must have been destroyed as of the date of the instrument is overruled. The test now is whether *any reasonable method, including such a method as of the date of this opinion,* of removal of the lignite, coal or iron will consume, deplete or destroy the surface.

2. At page 351 of 464 S.W.2d: "The ore must *be* mined [not must have been mined] by a process known as the open-pit or strip-mining method." Also on page 351, "The question of whether a grant or reservation of 'minerals' includes minerals that *are recoverable* only by open-pit mining has been considered" [by other states]. At

page 352, "Unless the contrary intention is affirmatively [shown] . . . a grant . . . of 'minerals' . . . should not be construed to include a substance that *must be removed* by methods that will . . . consume or deplete the surface estate." [Emphasis added].

The strip mining method of removal used in *Reed* is a reasonable method as a matter of law for the purposes of this holding.

Third, the opinion of the court of civil appeals on this appeal construed our first opinion in *Reed* to require that the deposit must outcrop, or be at the surface of, the particular tract in question, however small. This would require a trial as to every lot or plot in a large area of East Texas.

Again referring to *Acker*, which we reaffirmed in *Reed*, the *Acker* opinion, after the first and introductory paragraph, nowhere refers to the "land in question." The discussion in *Acker* refers to an area of East Texas and refers to the "iron ore deposits" which generally conformed to the earth's surface. The *Acker* opinion states that at some places, the deposits are at the surface, and in others "the soil and other materials overlying the ore are first removed . . ."

We have reexamined the record in *Acker*, and the only summary judgment proof in this regard is an affidavit by Acker which states in pertinent part:

> I have seen and know of many such deposits of commercial iron ore in Cherokee County, Texas; That such deposits exist, and which I have seen, *within a mile of the 68½ acre tract of land described* in Plaintiff's Second Amended Original Petition on file herein. The deposits of iron ore, in many instances, appear in cuts through hills along the highways and roadways of Cherokee County, Texas. [Emphasis added]

■ The proof in this record satisfied that requirement as a matter of law: an outcropping in a creekbed on the particular tract and another outcropping within half a mile; that is, the substance was at the surface in the reasonably immediate vicinity. The same would be true if the substance had been near the surface. A deposit which is within 200 feet of the surface is "near surface" as a matter of law.[3]

■ And finally, from the amicus briefs filed herein, it appears that our *Reed* opinion did not make clear the ownership of the same substance which is at or near the surface which may extend to, or be found at, greater depth. We affirm that holding in *Reed*; but to restate the rule for clarity, it is this: if the surface owner satisfies the tests set out above, and establishes ownership of the substance at or near the surface, he or she owns the lignite, iron, or coal beneath such land at whatever depth it may be found.

## REFORMATION

In our first opinion in *Reed*, we remanded the cause to the trial court. Reed again moved for summary judgment. The Wylies then amended their pleading. They included a counterclaim for reformation of the deed, claiming ownership of one-fourth of all lignite on the Reed-Wylie tract at whatever depth. Precedent for this action may be found in *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959). There we held that the deed did not reserve a one-fourth mineral interest to Martin, but we remanded for a new trial. That was to allow Martin the opportunity to prove mutual mistake as to the legal effect of the deed so that he was entitled to reformation.

The Wylies also answered Reed's motion for summary judgment and mentioned the counterclaim. They did not, however, move for summary judgment on the basis of their counterclaim. The Wylies attached affidavits to their answer to the motion for summary judgment. Included were affidavits from the Wylies; from Baker, the grantee; and from Bond, the attorney who prepared the original deed. All swore that before signing the original deed, the Wylies had required the assurance of Bond that they were reserving one-fourth of the lignite at any depth. Bond and Baker also swore that they intended to reserve one-fourth of the lignite at any depth to the Wylies and believed that the language of the reservation did reserve the lignite to the Wylies.

---

3.  See the discussion on this point in the dissenting opinion in *Reed*, 554 S.W.2d at 180 181.

The summary judgment record also contains a warranty deed dated December 15, 1953, wherein James F. Baker and wife, Evie A. Baker, conveyed the Reed-Wylie tract to R. I. Stewart; a warranty deed dated November 25, 1955, wherein Stewart and wife, Delores Stewart, conveyed the tract to W. H. Garrett; and a warranty deed from W. H. Garrett et al. to Bette Reed, Trustee, dated February 22, 1974. Records of the lignite leases are also included. The first lease, dated July 12, 1949, was granted by W. C. Wylie and wife, Iva Jack Wylie, to Roger Steward, Trustee. By its terms it included "clay, coal, lignite, and other minerals (except oil and gas)." It specifically provided for a payment for each acre where strip mining destroyed the surface. On May 14, 1964, W. C. Wylie and wife, Iva Jack Wylie, executed an amendment of coal and lignite lease covering the Reed-Wylie tract. That lease also provided for strip mining.

The uncontroverted affidavits of the Wylies, Baker, and Bond might entitle the Wylies to a reformed deed between the Wylies and Baker upon the basis of mutual mistake. The Wylies, however, seek reformation between them and Reed. The Wylies must show that all subsequent purchasers bought with notice of the mutual mistake in the 1949 Wylie-to-Baker deed in order to reform the deed. *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959).

In this court Reed claimed that reformation is an affirmative defense, but the Wylies claimed that it is a counterclaim. Were it an affirmative defense, the burden would be on Wylie to bring forward evidence on all issues of reformation in order to defeat Reed's summary judgment claim. *Torres v. Western Casualty and Surety Co.*, 457 S.W.2d 50 (Tex. 1970). Reformation was pleaded as a counterclaim, and is an affirmative request for relief which can stand by itself as a cause of action, rather than a matter of confession and avoidance. With regard to the claim for reformation, Reed was in the posture of a cross-defendant. She thus assumed the burden of showing that the Wylies were not entitled to reformation as a matter of law. Reed tried to discharge that burden by saying that the Wylies had brought no evidence that subsequent purchasers had notice of the mutual mistake. The only proof Reed has brought is the fact that Garrett, one of the subsequent purchasers, is dead. That is not enough to preclude the Wylies from proving at trial that subsequent purchasers had notice of the mutual mistake. *See Rio Bravo Oil Co. v. Hunt Petroleum Corp.*, 455 S.W.2d 722 (Tex. 1970).

Reed's argument that the Wylies' claim for reformation is barred by the four year statute of limitations is also unavailing. To merit summary judgment, Reed, as movant, has the burden of showing that no fact issue exists. Reed's only proof of the statute of limitations defense is the fact that the deed reserving a mineral interest to the Wylies was executed twenty-eight years before a claim for reformation was brought. Reed is not entitled to summary judgment under this theory because she has failed to show that no fact issue exists as to when the Wylies knew or should have known that a mutual mistake was made.

As above stated, there is but one judgment of the court of civil appeals; a reversal and remand. Its opinion, however, contained two major holdings. While we disagree with the holding of the court of civil appeals that fact issues exist as to the ownership of the lignite under our former opinion in *Reed v. Wylie* and hold that the lignite was not retained as "oil, gas and other minerals," the judgment of "reversal and remand" by the court of civil appeals is affirmed. That court correctly reversed the judgment of the trial court on the question of reformation. Upon remand, the trial will be upon the issue of reformation.

The judgment of the court of civil appeals is affirmed.

SPEARS, J., filed a concurring opinion.

GARWOOD, J., not sitting.

SPEARS, Justice, concurring.

I concur in the result reached by the majority. This result is dictated by the holdings of this Court in *Acker v. Guinn*, 464 S.W.2d 348 (Tex. 1971) and *Reed v. Wylie*, 554 S.W.2d 169 (Tex. 1977). I further agree with the majority opinion's analysis and interpretation of those decisions and its reexamination of *Reed v. Wylie*. The announced rule provides much relief from the uncertainty of "who owns the coal and lignite" extant under the decisions of *Acker* and *Reed*.

I cannot agree, however, that the resultant rule provides identifiable and workable criteria to either mineral owners or surface owners. I would go further and announce prospectively a rule that would enable any person reading a mineral lease or reservation to know *from the instrument itself* what has been granted or reserved without resort to factual investigation.

The majority holds that if in the reasonably immediate vicinity the mineral deposit is at or near the surface and any reasonable method of removal will consume, deplete, or destroy the surface, the minerals belong to the surface owner. Implicit in this holding are at least four possible fact issues which must be resolved in order to determine whether the surface owner or the mineral estate owner is entitled to the coal and lignite: (1) are there deposits in the "reasonably immediate vicinity"; (2) are there deposits "at or near" the surface; (3) must the deposits "conform generally to the contour of the earth's surface" as suggested by *Acker*; and (4) what is a "reasonable" method of recovery? No doubt, several decades of litigation could narrow these issues, but it will require numerous suits involving many tracts. Until then, the disputes over the criteria of ownership will guarantee a steady supply of lawsuits.

Several writers have thoughtfully examined the problems presented here. *See* Kuntz, *The Law Relating to Oil and Gas in Wyoming*, 3 Wyoming L.J. 107 (1948); Comment, *Lignite: Surface of Mineral— The Surface Destruction Test and More*, 29 Baylor L.Rev. 879 (1977); Note, *Beneath the Surface—Destruction Test: The Dialectic of Intention and Policy*, 56 Texas L.Rev. 99 (1977); 15 Hous.L.Rev. 197 (1977); 9 St. Mary's L.J. 624 (1978). In addition, several excellent amicus curiae briefs filed in this case have offered pertinent and helpful observations and suggestions. The common thread running through all of the law review articles and amicus curiae briefs is the need for a definite and certain rule of property law that would be fair, lend stability to land titles, and allow the development of vital energy sources to proceed, unimpeded by uncertainties of ownership. I have trouble believing that the holdings of the majority opinion accomplish these objectives.

Several writers would have us adopt a rule that would treat the issues of ownership of the substance and reasonable use of the surface as two separate questions. They urge that we construe the term "minerals" as those normally considered minerals regardless of the methods of extraction required, but limit the mineral estate owner to only a reasonable use of the surface to the extraction of the minerals. Surface destructive methods by the mineral estate owner already have been held unreasonable as a matter of law in *Acker*. Comment, *Lignite: Surface or Mineral—The Surface Destruction Test and More*, 29 Baylor L.Rev. 879 (1977); 9 St. Mary's L.J. 624 (1978).

Two of the amici curiae urge the adoption of a rule that unless specifically granted or reserved to the mineral estate or unless the contrary intention is affirmatively and fairly expressed in the instrument of conveyance or reservation, coal and lignite, at whatever depth found and by whatever method it is extracted, belong to the surface owner since the extraction of the particular substances would require large amounts of surface use. This rule could be easily applied with certainty and would conform to the general intent rule. In addition, it would internalize the costs of mining. *See* Note, 56 Texas L.Rev. 99, *supra*.

A third alternative would be to adopt the rule espoused by the thoughtful dissent in *Reed*. 554 S.W.2d at 179. The rule sug-

gested is fair, consistent, and easily understood—"other minerals" does not include lignite and coal.

A fourth alternative is simply a variation of the first suggested rule. The mineral estate owner under a grant or reservation of "oil, gas and other minerals" is entitled to those mineral substances that he can extract from the land by wells or shafts, using only so much of the surface as is reasonably necessary for the dominant estate owner to accomplish the purposes of his estate. *See Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971); Kuntz, *The Law Relating to Oil and Gas in Wyoming*, 3 Wyoming L.J. 107, 115 (1948). The mineral estate owner would not be allowed to employ any method of extraction that would destroy, deplete, or consume the surface or render it useless unless the instrument specifically grants or reserves the substance to the mineral estate or unless the contrary intention is affirmatively and fairly expressed in the instrument of conveyance or reservation. Absent a specific grant or contrary intention, as much of the mineral substance as is recoverable by surface-destructive methods, regardless of depth, would belong to the surface owner.[1] If the substance could be recovered by either strip mining methods or by wells or shafts, the dominant mineral estate owner would have priority, subject to the limitations prohibiting surface destruction and allowing only a reasonable use of the surface. This rule would both effect the general intent of the parties and preserve the horizontal severance of the mineral and surface estates. Furthermore, it is consistent with the rule in *Acker*:

A grant or reservation of minerals by the fee owner effects a horizontal severance and the creation of two separate and distinct estates: an estate in the surface and an estate in the minerals. . . . The parties to a mineral lease or deed usually think of the mineral estate as

including valuable substances that are removed from the ground by means of wells or mine shafts. This estate is dominant, of course, and its owner is entitled to make reasonable use of the surface for the production of his minerals. It is not ordinarily contemplated, however, that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired. Unless the contrary intention is affirmatively and fairly expressed, therefore, a grant or reservation of "minerals" or "mineral rights" should not be construed to include a substance that must be removed by methods that will, in effect, consume or deplete the surface estate. . . .

*Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971). I can conceive of no reason for prohibiting the division of the ownership of mineral substances based on the method of extraction.

Any one of the suggested tests would provide more certainty than the rule this court adopts. Whatever the rule, it should be such that the ownership of the substance in question can be ascertained from examining the instrument of grant or reservation alone. The rule should present the ownership of the substance as a question of law, not one that requires factual determinations based on the location of the substance.

It is axiomatic that rules of property are not to be tampered with lightly or easily changed. Persons rely on rules of property in the conduct of their affairs and are entitled to depend on the stability of those rules without periodic alterations occasioned by the changing winds of the day. To announce a new rule in this case, however, would not seem to cause harm to any person who may have acted in reliance on the *Acker* and *Reed* decisions. The only likely change in the conduct of surface owners who were aware of those decisions would have been to specifically name iron, coal,

---

1. Surface owners are further protected by the provisions of the Surface Mining and Reclamation Act, Tex.Rev.Civ.Stat.Ann. art. 5920–10 (Supp. 1976–77), which places regulation of strip mining in the Texas Railroad Commission under guidelines recently approved by the United States Department of the Interior. *See* Surface Mining Control and Reclamation Act of 1977, Pub.L. No. 95–87, § 503, 91 Stat. 445, 470 (1977).

and lignite in their grant or reservation and thus remove any doubt about their intent. Similarly, mineral lessees and grantees who wished to develop iron ore or coal and lignite after those decisions would have had to purchase rights to those substances from both the surface owner and the mineral owner in order to be assured that they had obtained the right to extract those substances. Those persons holding grants or reservations under instruments covering "oil, gas and other minerals" that were executed prior to those decisions did not rely one way or the other on the rule of the majority. They would, however, be governed by the rule of general intent—that such a grant or reservation of "oil, gas and other minerals" did not contemplate that the surface be destroyed in order for the grantee to recover the "other" unnamed minerals. I fail to perceive any possible harm by announcing a clearer rule.

This court should totally abandon the mire of factual differences requiring a tract-by-tract determination of mineral ownership by extrinsic evidence and move to higher solid ground. The expeditious development of Texas lignite as a vitally needed source of energy in the immediate future is at stake.