STORM ASSOCIATES, INC., et
al., Appellants,

v.

TEXACO, INC., et al., Appellees.

No. 16881.

Court of Appeals of Texas,
San Antonio.

Dec. 29, 1982.

Rehearing Denied Jan. 31, 1983.

Eugene B. Labay, San Antonio, Mark R. Paisley, Alice, Jorge C. Rangel, Corpus Christi, William A. Stovall, Kilgore, Margaret Mims, Austin, Violet Harlan, Houston, for appellants.

Oliver J. Butler, Jr., Brownsville, J.R. Schneider, George West, N.E. Maryan, Jr., Denver, Colo., Richard A. Brooks, Dallas, Kathleen E. Magruder, Houston, Mary Bollinger Jenkins, Gretna, La., for appellees.

Before CLARK, CANTU, and BASKIN, JJ.

## OPINION

BASKIN, Justice.

This is an appeal from consolidated declaratory judgment actions brought to construe mineral deeds, royalty deeds, oil, gas, and other minerals leases, a warranty deed, and a mining lease, and to determine the rights, titles, and interests under such instruments in uranium and associated minerals in and under 694 acres in McMullen County.

By deed dated June 23, 1930, Philippa Gunter Kynette and her daughter, Adele K. Friedman (Friedman), each acquired fee ownership of an undivided one-half interest in both the surface estate and mineral estate in the tract. The instruments, all of which were found to be unambiguous by the trial court, are:

June 11, 1937  Royalty deed from Philippa G. Kynette (Kynette) to J.N. Abel of 1/32 *royalty interest in and to all of the oil, gas and other minerals in and under and that may be produced from the tract,* subject to oil, gas and other mineral lease to M.I. Shaw.

January 9, 1939  Two (2) *oil, gas and other minerals* leases identical in terms, one executed by Kynette individually and one by Kynette for the estate of Lois Adele Kynette, a minor, to Magnolia Petroleum Company, predecessor of Mobil Oil Corporation (Mobil).

June 27, 1941  Royalty deed from Kynette to E.T. McDowell of one-fourth (1/4) interest in and to *all oil royalty, gas*

*royalty and royalty in casinghead gas, gasoline, and royalty in other minerals in and under and that may be produced and mined from the tract.*

(May 5, 1958 Kynette died testate leaving all her interest to her daughter Adele K. Friedman).

October 31, 1959 Warranty deed from Adele K. Friedman et vir. to T.J. Martin conveying title to the tract but grantor did not convey and grantee did not receive any "right, title or interest whatever in and to *the oil, gas and other minerals, in and under said tract of land* (the title to which mineral rights in said land shall be and remain in all things unaffected hereby), and Grantor expressly reserves ... her present interest and all rights necessary, proper, reasonable or incidental to the geological or geophysical exploration on said land, or to the development, production, handling, treating and marketing of the oil, gas and other minerals in said land, provided however, that payment for damage, if any, to the surface of said land caused by such operations, may be demanded by Grantee." Water, caliche and gravel were not considered minerals and all interest of the grantor to water, caliche, and gravel were conveyed to grantee, provided, however, that grantor reserved the right to produce and use all water, caliche and gravel necessary or proper to the oil, gas and mineral development and exploration of the land.

December 15, 1977 Mining lease from T.J. Martin individually and as agent and attorney-in-fact for others joined by his wife, Alberta Martin, and by T.J. Martin, Jr., individually and as trustee for his two minor children to Texaco, Inc. Lessor granted to Texaco all their interest in and to *"Leased Substances" to explore and prospect for and to develop, extract, mine, save, store, mill, process, concentrate, refine, stockpile, convert, treat, remove, transport, own, sell, dispose of, and market all Leased Substances.* Leased substances were defined as uranium, thorium, molybdenum, vanadium, and all other fissionable or associated minerals, together with all ores, minerals, metals, materials, elements, compounds, solutions, mixtures and source materials containing such substances, but specifically excluded oil, gas, casinghead gasoline, sulfur, condensates and associated hydrocarbon substances, and further specifically excluded coal, lignite, sand, gravel, and caliche. Lessee Texaco could use any mining method, including without limitation surface mining, open pit mining, shaft mining, tunnel mining and solution mining.

Adele K. Friedman, joined by her husband Sidney Friedman, brought suit seeking declaratory judgment that the warranty deed from Friedman to T.J. Martin (Martin) conveyed no interest in uranium. Mobil took essentially the same position as Friedman under its two oil, gas, and mineral leases of January 9, 1939. Successors to J.N. Abel under the royalty deed of June 11, 1937, were Harold Kaffie, et al. (Kaffie), and the successors to E.T. McDowell under the 1941 royalty deed were Storm Associates, Inc., et al. (Storm Associates). Kaffie and Storm Associates, by cross-action, took essentially the same position as Friedman and, in addition, asserted that even if uranium and associated minerals were a part of the surface estate conveyed to Martin rather than the mineral estate reserved by Friedman, they were nonetheless entitled to receive their respective royalties under the respective royalty deeds.

Martin, his wife, and various of their children and their spouses, for themselves and other minor children, entered into two "Pooled Substances Agreements" on August 23, 1977, and September 12, 1977. Such agreements were not brought forward with the record on appeal, but we are told, apparently without objection, that the purpose of the Pooled Substances Agreement was to pool various products and substances underlying the tract "which constitutes no part of the mineral estate" with like products or substances underlying other desig-

nated tracts of land. The agreements specifically purported to include "all uranium, vanadium, thorium, molybdenum, other fissionable source materials. . . . " Martin and the other Martins, by counterclaim and cross-action, argue that uranium was not a mineral reserved by Friedman in the mineral estate, but was a substance that was conveyed with the sale of the surface estate. Texaco, holding the lease from Martin and the other Martins, also by counterclaim and cross-action, is in the same posture.

Trial was to a jury which answered unanimously each of the four special issues submitted to it. In answer to Special Issue No. 1, the jury found that deposits of uranium and associated substances began at a depth of 20 feet beneath the surface. To Special Issue No. 2, the jury found that extraction or production of uranium and associated substances from beneath the surface of the tract could be accomplished "by the mining method known as 'strip mining' or 'open-pit mining'." By its answer to Special Issue

No. 3, the jury found that the process known as strip mining or open-pit mining was a reasonable method of extracting and producing uranium underlying the tract. In this regard the court instructed the jury that in order to be a "reasonable" method of production the method of removal must be both technically feasible and economically feasible. To Special Issue No. 4, the jury found that extraction or production of uranium and associated substances from beneath the surface of the tract by means of the method known as "strip mining" or "open-pit mining" would entail the substantial consumption, depletion, or destruction of the surface of the tract. The court defined the terms "substantial" and "consumed," "depleted" and "destroyed." We shall not burden an already lengthy opinion with a copying of the definitions.

The trial court made several findings[1] in the judgment which bear upon the appeal before us, holding in favor of Martin, the other Martins, and Texaco, and adversely to all other parties. In the decretal portion of

1. The trial court findings in pertinent part are as follows:

3. Deposits of Uranium and associated substances underly the surface of the Tract in the geologic formation known as the Shallow Oakville Sand beginning at a depth of 20 feet beneath the surface of the Tract and extending to a depth of approximately 58 feet beneath the surface of the Tract.

4. Additional deposits of Uranium and associated substances underly the surface of the Tract in the geologic formation known as the Basal Oakville Sand beginning at a depth of approximately 80 feet beneath the surface of the Tract and extending to a depth of approximately 111 feet beneath the surface of the Tract.

5. The gross amount of Uranium which underlies the surface of the Tract is in excess of 164,600 pounds, which is a substantial amount of Uranium.

6. The term "associated substances" as used in Findings 3 and 4 hereinabove and elsewhere herein includes thorium, molybdenum, vanadium, and other fissionable or associated substances.

7. Extraction or production of Uranium and associated substances from beneath the surface of the Tract can be accomplished by means of the mining method known as "strip mining" or "open-pit mining."

8. Extraction or production of Uranium and associated substances from beneath the surface

of the Tract cannot be accomplished by means of any presently known mining method other than the mining method known as "strip mining" or "open-pit mining."

9. The mining method known as "strip mining" or "open-pit mining" is a reasonable method of extracting or producing Uranium and associated substances from beneath the surface of the Tract.

10. Extraction or production of Uranium and associated substances from beneath the surface of the Tract by means of the mining method known as "strip mining" or "open-pit mining" would entail the substantial consumption, depletion, or destruction of surface soil of the Tract.

11. Uranium and associated substances underlying the surface of the Tract are "at the surface" of the Tract.

12. Uranium and associated substances underlying the surface of the Tract at all depths are a part of the surface estate in the Tract and are not a part of the mineral estate in the Tract.

13. T.J. MARTIN is and has been since October 31, 1959, the fee owner of the surface estate in the Tract, subject to the ownership interests therein . . . .

16. TEXACO INC. is and has been since December 15, 1977 the leasehold owner of Uranium and associated substances underlying the surface of the Tract at all depths.

the judgment, the trial court declared, ordered, adjudged, and decreed accordingly, awarding judgment to Martin, the other Martins, and Texaco, with take-nothing rulings as to the other parties.

This case is governed by the line of cases which have determined what substances are included in the term "mineral" as used in mineral deeds, oil, gas, and other minerals leases and other instruments. Limestone was held not to be a "mineral" as used in a will under which was devised to decedent's daughter "the surface rights exclusive of the mineral rights" and to a trustee for all her children "the mineral rights." *Heinatz v. Allen,* 147 Tex. 512, 217 S.W.2d 994 (Tex. 1949). The Supreme Court distinguished between a mineral in its technical sense and in its "natural and ordinary meaning." The Court held that where limestone was at the surface or at shallow depths and could be recovered only by quarrying or the open-pit method, which destroys the surface, the intent was not to convey limestone as a mineral. The fact that it was recoverable only in that way was not decisive, but was a factor to be used in determining the intent in a conveyance or reservation of minerals. A similar result was reached in *Psencik v. Wessels,* 205 S.W.2d 658 (Tex.Civ.App.— Austin 1947, writ ref'd), in which the court held that although sand and gravel were minerals within a technical sense as inorganic matter forming a part of the soil, sand and gravel were not minerals as that term is ordinarily used. The court said that to determine whether sand and gravel were reserved in a mineral reservation the general meaning of the term "minerals" would govern, and the court found that sand and gravel were not included within the reservation of minerals.

In *Acker v. Guinn,* 464 S.W.2d 348 (Tex. 1971), the Supreme Court faced the question of whether an interest in iron ore passed under a deed which conveyed a "½ interest in and to all of the oil, gas and other minerals in and under, and that may be produced from" a tract in Cherokee County. The iron ore in commercial quantities is found at or near the surface to a depth of 50 feet, the deposits conforming generally to the contour of the surface. The Court pointed out that a grant or reservation of minerals by the fee owner effects a horizontal severance, creating separate estates in the surface and in the minerals. The Court further noted that the parties to a mineral lease or deed usually think of the mineral estate as including valuable substances to be removed from the ground by wells or shafts, and they do not ordinarily contemplate destruction or impairment of the utility of the surface for agriculture or grazing. A specific holding was, "Unless the contrary intention is affirmatively and fairly expressed, therefore, a grant or reservation of 'minerals' or 'mineral rights' should not be construed to include a substance that must be removed by methods that will, in effect, consume or deplete the surface estate." Applying the rule enunciated, the Court held that as a matter of law the iron ore, like gravel and limestone, should be considered as belonging to the surface estate and not as a part of the minerals.

Six years later the Supreme Court faced a similar question with regard to coal and lignite in *Reed v. Wylie,* 554 S.W.2d 169 (Tex.1977) (*Reed I*). By a 1950 deed, grantor had reserved a one-fourth interest in and to all oil, gas and other minerals on and under the land conveyed. Reviewing its opinion in *Acker,* the Court pointed out that it had held that general intent rather than specific intent governed, unless the contrary intention is affirmatively and fairly expressed. In *Reed I* there was little discussion of the location of the lignite because the summary judgment below was going to be reversed. The Court reaffirmed its decision in *Acker* that a substance is not a "mineral" if substantial quantities lie so near the surface that production would entail stripping away and substantial destruction of the surface. The rule, as amplified in *Reed I,* was that in order for a surface estate owner to be entitled to the substance, he must prove that, (1) as of the date of the instrument being construed, if the substance near the surface had been extracted, (2) extraction would

necessarily have consumed or depleted the land surface. If the substance lies at the surface, *no further proof* is required to establish title in the surface owner. Ancillary to that rule the Court said that methods of restoration were immaterial, that the thinking or intention or knowledge of the parties would be immaterial, and that the value of the substance on the date of the instrument or later would not change the rule of construction announced in *Acker.*

The same case came before our Supreme Court once more in *Reed v. Wylie,* 597 S.W.2d 743 (Tex.1980) (*Reed II*). The facts were that low grade or oxidized lignite, which was not of sufficient value to be mined because of its low BTU content, began at seven or eight feet beneath the surface and the hard lignite began at twenty or twenty-two feet in one vein, running about parallel with the surface, and in another vein at about twenty feet, extending to a depth of eighty feet. The Court, stating that the word "surface" as used in *Reed I* has some depth, affirmed the holding of the trial court that as a matter of law, lignite was at the surface, was part of the surface estate, and was not reserved by the grantor as "oil, gas and other minerals," citing the *Acker* and *Reed I* decisions.

The major import of *Reed II* is found in the amendment of the earlier rules with regard to necessity of mining by surface-destructive methods and the time at which such determination is fixed. The Court said, "The test now is whether *any* reasonable method, including such a method as of the date of this opinion, of removal of the lignite, coal or iron will consume, deplete or destroy the surface." *Id.* at 747 (emphasis added). The Court also held that a deposit which is within 200 feet of the surface is near the surface as a matter of law, and if a surface owner satisfied the tests given, and established ownership of a substance at or near the surface, he or she would own the lignite, coal or iron beneath the land at whatever depth it may be found.

■ It is suggested by Texaco that in *Acker* the Supreme Court "unanimously and implicitly overruled" this court's opin-

ion in *Cain v. Neumann,* 316 S.W.2d 915 (Tex.Civ.App.—San Antonio 1958, no writ) insofar as *Cain* dealt with uranium as a mineral. We disagree. Writing in *Cain,* Justice Pope did no more than hold that a lease which granted "all of the oil, gas, coal, and other minerals" indicated a grant of all minerals including uranium. *Cain* in that regard merely stated that the *ejusdem generis* rule is inapplicable in Texas and that whether the lessor and lessee knew of the existence of uranium at the time of the lease did not alter their expressed intent to convey "all" minerals. Judge Pope cited with apparent approval *New Mexico & Arizona Land Co. v. Elkins,* 137 F.Supp. 767 (D.N.M.1956). That case also held specifically that uranium and thorium, being minerals in the scientific, geological, and practical meanings, would constitute minerals within the purview of the reserving clause "all oil, gas and minerals." In like manner, there was testimony in the instant case that uranium is a mineral.

We read *Acker* to mean that the Supreme Court did not disagree that uranium is a mineral substance, that the *ejusdem generis* rule is not followed in Texas, and uranium was not excluded because it was unknown when the lease was executed. The Court adopted some language from KUNTZ, *The Law Relating to Oil and Gas in Wyoming,* 3 Wyo.L.J. 107, 112 (1949), which is supportive of our earlier holding. We do not read *Acker* and the *Reed* cases to mean that iron ore, coal, and lignite are not minerals in scientific, geological, and practical terms. We understand the Court to say that because of the proximity to the surface of those substances, and the general intention of a surface estate owner not to have his land destroyed, those substances were not a part of the mineral estate in those particular cases. We hold that uranium compounds as found in nature constitute minerals scientifically, geologically, and practically, and that unless the rules expressed in *Acker* and the *Reed* cases dictate otherwise, they are minerals which are conveyed or reserved in deeds or leases which purport to grant or reserve oil, gas, and other miner-

als. This holding is undergirded by the opinion in *Moser v. United States Steel Corp.*, 601 S.W.2d 731 (Tex.Civ.App.—Eastland 1980, writ granted), in which the application of *Acker* and *Reed II* to uranium was recognized and applied.

■ By their first and second points of error, appellants Friedman and Mobil aver that the trial court erred in refusing to submit to the jury requested special issues asking (1) whether the mineral reservations contained in the 1959 deed fairly and affirmatively expressed the intentions of the parties that uranium was to be reserved to the grantor and (2) whether the 1939 oil, gas and mineral leases fairly and affirmatively expressed the intentions of the parties that uranium was to be included and covered within the leases. These appellants were thus attempting to bring themselves within the exclusionary language in the rule as expressed in *Acker* which we have quoted. These appellants cite us to no cases other than *Cain, Acker, Reed I,* and *Reed II.*

Friedman and Mobil relied upon the clause in the 1959 deed which provided for the payment of damages to the surface as evidencing specific intent that uranium was to be reserved to the grantor. We observe that that provision is preceded by the reservation of right to explore for minerals, and the provision itself immediately preceded the reservation of right to use water, caliche, and gravel minerals excluded in the reservation clause, in the exploration for and development of oil, gas, and other minerals. These reservations of right necessarily contemplated some damage to the surface but not of destruction of the surface which surface or pit mining would occasion.

■ Construction of the terms of an unambiguous instrument is a legal question to be determined by the court rather than a fact issue for the jury. *American-Amicable Life Insurance Co. v. Lawson,* 419 S.W.2d 823 (Tex.1967); *First National Bank in Dallas v. Kinabrew,* 589 S.W.2d 137 (Tex.Civ. App.—Tyler 1979, writ ref'd n.r.e.). Where the instrument is unambiguous, the court will look solely to the four corners of the instrument for a determination of its meaning. *Houston Lighting & Power Co. v. Tenn-Tex Alloy & Chemical Corp.,* 400 S.W.2d 296 (Tex.1966). The rules developed in *Acker* and the *Reed* cases refer to a general intent rather than a specific intent, unless the specific intent is found in the language of the instruments of conveyance; and this is so as a matter of law. By refusing to give the requested special issues, the trial court effectively found that, as a matter of law, the language of the 1959 deed contained no fair and affirmative expression of intent to reserve uranium at or near the surface, recovery of which would destroy the surface, nor did the terms of the 1939 leases include and cover such uranium. We agree and therefore overrule points of error one and two of Friedman and Mobil.

■ The third point of error raised by Friedman and Mobil is one of insufficiency of the evidence to support the jury's finding to Special Issue No. 3 that "the production of uranium from the subject tract by the process known as strip mining or open-pit mining is a reasonable method of extracting and producing the uranium underlying the subject tract." The underlying argument is that Texaco and the Martins failed to show that it was economically as well as technically feasible to so remove the uranium beneath the surface. The argument is based in turn upon testimony of Friedman and Mobil's expert witness that uranium could not be economically produced from the tract and that in his opinion it could not in the past have been extracted profitably.

Edward Oakes, the only geologist to testify, and whose written report was admitted in evidence, determined that an ore body existed at 80½ to 113½ feet below the surface; and he used the expression "ore" to mean mineral that could be mined, milled, and the uranium oxide, $U_3O_8$, described as yellow cake, marketed with the expectation of profit. Geoffrey Hunkin, Texaco's mining engineer, described "ore" in substantially the same terms. He described the ore deposit on the tract as "substantial." He agreed on cross-examination that the ore

could not be extracted at a profit at that time but said that the deposit had value then and in the future. The trial court instructed the jury that they could find the pit-mining method to be a reasonable method if they found it was both technically feasible and economically feasible. We hold that the evidence was sufficient to support the jury's finding to Special Issue No. 3. Friedman and Mobil's third point of error is overruled.

■ Friedman and Mobil, in their fourth point of error, contend that the trial court erred in admitting into evidence oral testimony and written exhibits concerning methods of production other than strip mining on the ground that such evidence was irrelevant and prejudicial. Neither appellants nor Texaco give us any legal authority. The evidence showed that there are three basic techniques for removal of uranium ore from the ground. These are strip mining or open-pit mining in which overburden is removed from the surface down to expose the mineral occurrence, followed by mining of the ore body; underground mining in which extraction of the ore body is obtained by selective excavation from access gained by shafts and tunnelling from the shafts to the ore body; and in-situ solution mining in which access to the ore body is by bore holes from the surface and the uranium is leached into solution by circulation of aqueous chemical solutions. Hunkin testified that a mining engineer considers the geologist's report and the hydrologist's report and then, from his knowledge of mining methods, recommends the method or methods to be used to extract the ore. In this case Hunkin reached the conclusion that open-pit mining was a feasible, and the only feasible, method of mining the uranium. We conclude that such evidence was relevant to the issues before the trial court and that the trial court properly admitted it. Friedman and Mobil's fourth point of error is overruled.

■ The fifth and final point of error urged by Friedman and Mobil is that the trial court erred by not granting a new trial or disregarding findings on special issues because there was insufficient evidence to support the jury's finding that deposits of uranium and associated substances begin at a depth of twenty feet. These appellants point out that uranium is found widely and that beneath the tract uranium "presence" or mineralization is found beginning at twenty feet in the Shallow Oakville Sand, in the Basal Oakville Sand at 80½ to 113½ feet and in the Catahoula Shale at about 200 feet. Edward Oakes, the geologist, testified that the only measurable uranium ore was in the Basal Oakville Sand and that he had determined that there were 164,600 pounds in that Basal Sand. He found that the amounts in the Catahoula were negligible. He testified that the amount of uranium in the Shallow Oakville was minor by comparison to that in the Basal Oakville, and the amount in the Shallow Oakville Sand had not been measured. On the other hand, his report, which was in evidence, indicated that there were "significant amounts" of uranium in the Shallow Sand, and that although there was no reliable quantification of the amount of uranium that might be found there, the Shallow Oakville Sand "displays excellent potential for hosting substantial amounts of uranium." We cannot say that this was insufficient evidence upon which the jury could rely in answering Special Issue No. 1. We are unable to determine from the evidence whether uranium compounds exist in *commercial quantities* closer to the surface than 80½ feet, and it seems to us that the Supreme Court would apply the rule of *Acker* and *Reed* only in instances in which the mineral substance at or near the surface exists in commercial quantities. These appellants did not, however, request such an instruction in connection with Special Issue No. 1 nor preserve error with regard thereto. Friedman and Mobil's fifth point of error is overruled.

■ The first points of error of both Storm Associates and Kaffie are that the trial court erred in overruling their respective motions for judgment and in entering take-nothing judgments against them because they had proved their respective

right, title, and royalty ownership in uranium and associated substances in, upon, and under the subject tract as a matter of law. The second points of error of both Storm Associates and Kaffie are that the trial court erred in entering judgment that they had no interest in the uranium and associated substances underlying the surface of the subject tract at any depth because the undisputed evidence established that they had a royalty interest in uranium and all other minerals in and under and that may be produced and mined from the tract. We shall consider these points of error together, as did those appellants.

Those appellants rely heavily, indeed almost exclusively, upon the decision in *Martin v. Schneider,* 622 S.W.2d 620 (Tex.App. —Corpus Christi 1981, no writ) and the reasoning upon which it is based. Interestingly, the trial judge in *Martin v. Schneider* was the trial judge below. The court of appeals held in *Martin* that the royalty reservation in a warranty deed was effective to retain royalties in uranium subsequently discovered in commercial quantities on the land which was sold. The Corpus Christi court reasoned that because a non-participating royalty interest in "other minerals" carries with it no right to interfere with the surface, but only a right to receive a portion of the royalty if minerals are produced, the reservation of royalty interest was effective as to uranium even though uranium was found at or near the surface. The court held, however, that the ownership of the uranium vested in appellants as owners of the *mineral estate* but that if they should ever decide to mine it, appellees would be entitled to receive one-half of the royalty.

■ We do not believe that *Martin v. Schneider,* requires the interpretation put upon it by Storm Associates and Kaffie. Our Supreme Court said in *Acker,* "The parties to a mineral *lease* or deed usually think of the mineral estate as including valuable substances that are removed from the ground by means of wells or mine shafts." *Acker v. Guinn, supra* at 352 (emphasis added). The Court had just adopted the thinking by Kuntz that the intention of

the parties to grant or reserve minerals must be determined by a general intent; and the Court proceeded to hold that unless the contrary intention is affirmatively and fairly expressed, a grant or reservation of "minerals" or "mineral rights" should not be construed to include a substance that must be removed by methods that consume or destroy the surface. While both *Acker* and *Reed* dealt directly with ownership of minerals rather than royalty interest, we think that the general intent of parties would be the same. In the ordinary oil, gas and other minerals lease, the landowner (assuming that the surface and mineral estates have not theretofore been severed) "leases" to lessee the oil, gas and those minerals, the removal of which will not destroy the surface, and retains a right to receive royalty when oil, gas or other minerals are produced. The interest so reserved, normally called a royalty interest, is an interest in the mineral estate as realty. *Eternal Cemetery Corp. v. Tammen,* 324 S.W.2d 562 (Tex.Civ.App.—Fort Worth 1959, writ ref'd n.r.e.). *See also Benge v. Scharbauer,* 152 Tex. 447, 259 S.W.2d 166, 168 (Tex.1953). As expressed by another court, the owner of a *mineral estate* possesses a bundle of interests, one of them being the right to sever royalty interests in the mineral estate; and when the varying forms are conveyed or reserved, they become separate estates. *Extraction Resources, Inc. v. Freeman,* 555 S.W.2d 156 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r. e.). These appellants, because theirs are non-participating royalty interests, have incorporeal interests in the land, but they are interests in the mineral estate. *Bagby v. Bredthauer,* 627 S.W.2d 190 (Tex.App.— Austin 1981, no writ). These cases are not necessarily in conflict with *Martin v. Schneider, supra,* because the court in *Martin* found that the appellant owned the *mineral estate;* and we must assume that the royalty reserved was an interest in the mineral estate. That is not the case here, where the trial court has found, and we have agreed, that Martin owns the uranium by virtue of ownership of the surface estate, not of the mineral estate. We there-

fore overrule the first and second points of error of Storm Associates and Kaffie.

The third points of error of both Storm Associates and Kaffie are that the trial court erred in overruling their respective motions for judgment *non obstante veredicto* and to disregard jury findings, and in entering a take-nothing judgment against each of them, claiming that appellees failed to prove that the 1959 Martin deed conveyed any interest in uranium and associated substances and failed to obtain jury findings to support the judgment in their favor. We have heretofore overruled such a contention when made by Friedman and Mobil in their first and second points of error, and we find it unnecessary to repeat what we have said. The third points of error of Storm Associates and of Kaffie are overruled.

The fourth point of error of Kaffie and the fifth point of error of Storm Associates assert that the trial court erred in entering a take-nothing judgment against each of them, as each had proved all of the essential elements of the causes of action asserted in their respective cross-actions as a matter of law and that each was entitled to entry of judgment in their favor. For reasons given above in our discussion of those appellants' first points of error, we overrule these points of error.

By its fourth point of error, Storm Associates contends that the trial court erred in granting Texaco's motion for directed verdict on appellant's claim of adverse possession and in entering a take-nothing judgment against it, claiming that the undisputed facts established limitation title to a royalty interest in all minerals, including uranium and associated substances as a matter of law.

Adverse possession is defined by article 5515, Tex.Rev.Civ.Stat.Ann. (Vernon 1958):

"Adverse possession" is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another.

The cases have stressed occupancy. *Rick v. Grubbs,* 147 Tex. 267, 214 S.W.2d 925 (Tex. 1948); *Dingman v. Spengler,* 371 S.W.2d 416 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.). Storm Associates took the position in the trial court and takes the position in this appeal that it does not own any part of the mineral estate but has only an incorporeal hereditament. This position is antithetical to actual and visible appropriation of the land. Storm Associates' fourth point of error is overruled.

By its sixth point of error, Storm Associates avers that the trial court erred in granting Texaco's motion for directed verdict on its claim of slander of title because every element of its cause of action for slander of title was conclusively established. The seventh and final point of error of Storm Associates is that the trial court erred in excluding evidence regarding reasonable attorney's fees and litigation expenses (in developing the slander of title claim) and in entering judgment denying recovery for such items. Storm Associates wholly failed to show themselves entitled to recover damages for slander of title. The necessary elements for such a cause of action were stated in *Associates Investment Co. v. Tyler,* 378 S.W.2d 717 (Tex.Civ.App. —San Antonio 1964, no writ):

It is settled in this State that in order for a party to recover in an action for defamation or slander of title, he must allege and prove: (1) the uttering and publishing of the slanderous words; (2) that they were false; (3) that they were malicious; (4) that he sustained special damages thereby; and, (5) that the person suing possessed an estate or interest in the property slandered. (Citations omitted.)

*Id.* at 718. We have reviewed the evidence and there is nothing that would sustain findings of slander of title, far less to require the trial court to find for Storm Associates as a matter of law. A claim of title does not constitute malice where the claim is made under color of title or upon reasonable belief that parties have title to the property acquired. *Humble Oil & Refining*

Co. v. Luckel, 171 S.W.2d 902 (Tex.Civ.App. —Galveston 1943, writ ref'd w.o.m.). Finally attorney's fees are not recoverable in a slander of title suit. *American National Bank v. First Wisconsin Mortgage Trust,* 577 S.W.2d 312 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.). The trial court properly disposed of Storm Associates' claims for slander of title and attorney's fees and expenses, and the sixth and seventh points of error are overruled.

Texaco raised one point of error, claiming that the trial court erred in qualifying Menelaos D. Hassialis as an expert in the area of mining engineering and admitting his opinion on the ground that he had no formal education in geology, hydrology or mining engineering and was not a registered engineer in Texas or in any other state. The trial court has broad discretion in determining whether to allow expert testimony, and the exercise of that discretion will not be overturned absent an abuse. *Stanley v. Southern Pacific Co.,* 466 S.W.2d 548, 551 (Tex.1971); *Southwestern Bell Telephone Co. v. Sims,* 615 S.W.2d 858, 862 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). Menelaos Hassialis testified that he did consulting work in the fields of mining, milling, and mineral economics, and in management dealing with the cutting tool industry. He has been awarded the honorary Doctor of Science degree by Bard College for his contributions to the nuclear program of the United States. He was a full professor of mineral engineering at Columbia University and at his retirement he was Henry Crum Professor of Mining and Mineral Economics and Executive Officer and Chairman of the School of Mines at Columbia University. The trial court did not abuse its discretion qualifying Hassialis. Texaco's point of error verges upon the frivolous, and it is overruled.

The judgment is affirmed.