**LIQUID ENERGY CORPORATION, Appellant,**

v.

**TRANS–PAN GATHERING, INC., Trans–Pan Pipeline Company, and W.R. Edwards, Jr., Appellees.**

**No. 07–86–0200–CV**

Court of Appeals of Texas, Amarillo.

Aug. 26, 1988.

Rehearing Denied Oct. 13, 1988.

628

Hinkle, Cox, Eaton, Coffield & Hensley, Richard R. Wilfong, Jerry F. Shackelford, and David T. Markette, Amarillo, for appellant.

Rain, Harrell, Emery, Young & Doke, Marshall M. Searcy, Jr., Dallas, Gassaway, Gurley, Sheets & Mitchell, Jody G. Sheets and Timothy D. Zeiger, Borger, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

In this cause involving contractual claims and counterclaims, Liquid Energy Corporation appeals on eighty-three points of error from a judgment, rendered after a bench trial, decreeing its monetary liability to Trans–Pan Gathering, Inc. and Trans–Pan Pipeline Company, granting injunctive and declaratory relief, and awarding attorneys'

fees. Trans–Pan Gathering, Inc., Trans–Pan Pipeline Company, and W.R. Edwards, Jr., who was adjudged to take nothing on his claim, have responded with ten reply points and seven cross-points. For the reasons explained, the judgment will be affirmed.

### 1. Background

Liquid Energy Corporation (LEC), a wholly owned subsidiary of Mitchell Energy, Inc., is a Texas corporation, which owns and operates a gas processing facility and related facilities in Hutchinson County. Trans–Pan Gathering, Inc., a wholly owned subsidiary of REO Industries, Inc., is a Texas corporation, which gathers gas from producers in the Texas Panhandle Field in Hutchinson and Moore Counties. Trans–Pan Pipeline Company is a partnership, the managing partner of which is Trans–Pan Gathering, Inc., formed under the laws of Texas to transport gas. Both Trans–Pan organizations are referred to as Trans–Pan unless it is appropriate to designate one of them by name. W.R. Edwards, Jr. is president of Trans–Pan Gathering, Inc., and acts as a representative of the Trans–Pan organizations.

On 15 June 1984, LEC and each Trans–Pan organization formalized separate "Gas Processing" and "Gas Purchase" agreements, which are regarded as the four original contracts. By the terms of the agreements, Trans–Pan would purchase, gather, and deliver gas to LEC at LEC's REO–Barnhill Compressor Station, where LEC would accept all gas delivered, measure it, pump the gas to its Canadian River Gas Processing Plant for processing to extract liquid hydrocarbons, for which LEC would pay Trans–Pan a percentage of the gross sales, and after processing, redeliver the unused residue gas at the tailgate of the plant for measurement and purchase by LEC at a price fixed by the contracts. In this regard, Trans–Pan was required to deliver "pipeline quality" gas and LEC was obligated to accept delivery only if certain minimum standards were met. One standard was that the gas contain no more than three percent (3%) nitrogen; another was that the gas contain a specified minimum BTU (British thermal unit) heating value.

The agreements provided that LEC shall maintain measuring equipment of standard make and design commonly acceptable in the industry to accurately measure the gas delivered at the point of delivery and the gas processed at the point of redelivery. Sufficient samples for accurate analysis were to be taken at both points on a continuous basis. The meters were to be verified at least once a month for accuracy, and Trans–Pan was to be notified at least ten days prior to each test. Trans–Pan had the right to install and operate check measuring equipment at the point of delivery.

Among the other contractual provisions was one stating that LEC would not be obligated to continue to operate its processing plant and facilities if, in its sole judgment, the operation shall be deemed unprofitable. Upon LEC's giving Trans–Pan notice of the date its operations would be discontinued, which would not be earlier than three months after the date of the notice, the agreements shall terminate.

Trans–Pan delivered gas to LEC at the point of delivery through Trans–Pan Gathering, Inc.'s eight-inch line and Trans–Pan Pipeline Company's six-inch line, beginning in June of 1984. Later, on 4 March 1985, Trans–Pan sent to LEC a demand letter. Trans–Pan expressed that LEC had continuously failed to render correct accountings for gas purchased, was delinquent in paying the contract price for the volumes of gas delivered, and its consistent breaches of contract impaired Trans–Pan's expectations of receiving due performance of the contract provisions. Trans–Pan demanded that LEC provide adequate assurance of due performance, including prompt payment of all sums owed to Trans–Pan.

Then, on the following March 11, LEC reminded Trans–Pan of its 30 November 1984 letter, by which it gave Trans–Pan notice of its unprofitable operations and intent to cease operations unless certain modifications were made to the payments due Trans–Pan under the agreements. LEC further stated that although the three month notice required expired on 28 Febru-

ary 1985, the shutdown date was being extended to 1 April 1985 because of ongoing negotiations, but that operations would cease on that date if their negotiations were not sooner finalized.

Seven days afterward on March 18, Trans–Pan communicated to LEC its intent to continue delivering gas to the REO–Barnhill compressor station even if LEC decided to shut down its Canadian River processing plant, and that on 1 June 1985, its delivery of gas would increase to forty million cubic feet per day. In turn, on March 21, LEC notified Trans–Pan that because its gas contained more than three percent nitrogen, LEC would refuse to accept the gas beginning the next day, March 22.

On 25 March 1985, Trans–Pan initiated the action underlying this appeal, seeking money damages and injunctive relief from LEC. Afterwards on April 12, LEC notified Trans–Pan that the Canadian River plant would close on 13 July 1985. In response to Trans–Pan's court action, the district court, on April 29, temporarily enjoined LEC from refusing to accept, process, and purchase gas delivered by Trans–Pan.

Subsequently on May 1, LEC and Trans–Pan executed two "Supplemental Agreements" to modify the original contracts. LEC rescinded its April 12 letter of intent to discontinue operation of its processing plant. The parties agreed to a temporary adjustment of the residue gas prices and processing payments to be paid by LEC to Trans–Pan, and provided that the theoretical recovery accounting method set forth in their 31 October 1984 agreement shall be effective for gas delivered under the original gas processing contract from April 1 through October 31, 1985. The parties further agreed to negotiate in good faith to reach amendments to the original contracts providing for the gas prices and processing payments, and to stay all proceedings in the court action until July 31. If the parties had not reached and executed agreements to the original contracts by July 31, LEC retained the right, to be exercised not later than August 10, to give Trans–Pan notice of its reinstated intent to discontinue, and to discontinue, the operation of its Canadian River processing plant on 1 November 1985. Trans–Pan Pipeline Company was given the option to sell and deliver gas, which LEC would release from coverage under the contracts, to third parties from May 1 through October 31, 1985. Additionally, the parties provided that all terms and conditions of the original contracts not modified by or inconsistent with the supplement agreements would remain in full force and effect.

Subsequent court proceedings ensued. As a result of a 4 September 1985 hearing set on LEC's motions for continuance and other relief, the parties, outlining areas of agreement and without offering evidence, agreed that the court's order was going to be signed by counsel as an agreed order. The order signed by the court on 18 September 1985 regulated the proceedings and specified, among other matters, that prior to the judgment on the merits, LEC will accept and process all casinghead gas Trans–Pan is capable of delivering and "purchase and pay for all of [Trans–Pan's] residual casinghead gas, all as more fully set forth in the contracts attached to the [pleadings] as Exhibits 'A' through 'D'. If at any time prior to judgment, [LEC] encounters any substantial inability to accept, process and purchase casinghead gas deliverable by [Trans–Pan], [LEC's] counsel will promptly notify [Trans–Pan's] counsel and this Court." The attached exhibits were copies of the original contracts only. Counsel endorsed the order as "APPROVED FOR ENTRY AS AN AGREED ORDER."

W.R. Edwards, Jr. became a plaintiff in the action on September 10 when he joined Trans–Pan in filing a first amended original petition. The following September 23, Trans–Pan and Edwards filed their second amended original petition, their live trial pleadings.

By these pleadings, Trans–Pan and Edwards sought damages amounting to millions of dollars for LEC's (1) breaches of contract by failing to account for gas and liquids received, and to accept gas and liq-

uids delivered, (2) damages to Trans–Pan's business reputation and to Edward's reputation, (3) causing Trans–Pan and Edwards to lose the sales of their assets, and (4) anticipatory breaches of the contracts. Sought also were (5) specific performance of the four original contracts, with a declaration (6) of the contract provisions and (7) that the 1 May 1985 supplemental agreements were void.

Three days later on September 26, LEC filed its second amended original answer. With it, LEC lodged special exceptions, interposed a plea in abatement and affirmative defenses, counterclaimed for damages for Trans–Pan's breach of the original processing contracts by upstream removal of liquid hydrocarbons from the gas, and sought attorney's fees. The court denied all of the special exceptions and the plea in abatement.

The cause was tried before the court for several days beginning in September and extending into October. By its December 12 and 31 letters, the court informed the parties of its ruling on the declaratory judgment requests with a conformable modification of the temporary injunction, and its opinion that Trans–Pan is entitled to damages in the amount of $947,717.10 as a result of LEC's failure to properly and adequately measure and account for the gas volumes and BTUs received, together with attorneys' fees in the amount of $94,771.76.

Thereafter on 15 January 1986, Trans–Pan and Edwards moved the court to reopen evidence, to alternatively grant a new trial, and to adjudge LEC in contempt for violation of the court's 18 September 1985 injunctive order. The court, hearing the motion to reopen evidence or alternatively grant a new trial on January 22 and the motion for contempt on January 30, notified the parties by its March 24 letter that the relief sought should be denied. At the same time, the court requested the preparation of an order accordingly, but no order to that effect was signed.

After considering post-hearing briefs in connection with the evidence heard, the court rendered final judgment on 1 May 1986. The court decreed that Trans–Pan recover from LEC the amounts of: (1) $947,717.10 as damages (the amount of damages stated in the court's 31 December 1985 letter), together with prejudgment interest of $90,641.82; and (2) $484,561 found to be due for underpayment for gas and liquid purchased under the terms of the agreed 18 September 1985 temporary injunction, together with prejudgment interest of $21,150.33. The court further decreed that the law firms of Gassaway, Gurley, Sheets & Mitchell and Rain, Harrell, Emery, Young & Doke each recover from LEC the sum of $47, 385.85 (the approximate total of the $94,771.76 award of attorneys' fees stated in the court's 31 December 1985 letter) as attorneys' fees.

Additionally, the court declared that under the original contracts, (1) LEC is entitled to discontinue operation of its Canadian River processing plant and related facilities on 1 November 1985, (2) and, upon discontinuation of the operation, the original gas processing contracts shall terminate, (3) but LEC is obligated to purchase 100% of Trans–Pan's casinghead gas, (4) which, if the processing operation is discontinued, is to be delivered to the tailgate of the processing plant. Next, the court declared that (5) LEC's 21 March 1985 letter was a reasonable retraction of its previous waiver of the nitrogen specification, and LEC has the right to insist upon the quality specifications set forth in the original gas purchase contracts. Further, the court declared that the purchase price for all gas delivered by Trans–Pan for processing or purchase by LEC shall be the price set out in the original contracts. The court fashioned an order conformable to its declarations.

The court then ordered that Edwards take nothing by his claim and that LEC take nothing by its counterclaim. Finally, the court denied all other relief requested by the parties that was not granted.

Responsive to LEC's request for findings of fact and conclusions of law, the court made and filed sixty factual findings and ten legal conclusions. LEC's request for

additional and amended findings and conclusions was denied.

LEC moved the court to modify and reform the judgment. When the motion was overruled by operation of law, LEC perfected this appeal.

### 2. Damages and Prejudgment Interest Awards

The first sixteen of LEC's eighty-three points of error are grouped for presentation and have been replied to in the same manner. The points are LEC's challenges to each aspect of the record that LEC perceives it must refute to establish its contention that the awards of $947,717.10 as damages and $90,641.82 as prejudgment interest are erroneous.

### a. Damages

At the outset, it is appropriate to notice that the dispute focuses on the calculation of the amount of gas Trans–Pan delivered to LEC's REO–Barnhill compressor station, and not on the amount of residue gas redelivered at the tailgate of LEC's Canadian River plant. In this regard and as previously mentioned, the original gas processing contracts required LEC to install and maintain measuring equipment, commonly acceptable in the industry, to accurately measure the gas delivered to the point of delivery at the REO–Barnhill compressor station. By the same contracts, Trans–Pan was extended the right to install and operate check measuring equipment at the same point if there was no interference with LEC's measuring equipment.

■ Initially, LEC refers to the contractual provisions to point out that it was required to, as it did, install and maintain the measuring equipment, and Trans–Pan did not install its check measuring equipment; that if its measurements were found to be more than 2% in error, the previous reading would be corrected to zero for the period covering the test or for any period agreed upon; and that it was responsible for allocating between Trans–Pan and other deliverers their gas that was permitted to be delivered in a commingled stream. From this, LEC envisions a contractual

method for measuring gas and resolving disputes, and submits that the trial court had no authority to disregard the contractual method. This results, LEC asserts, because where the contractual language is plain, clear and unambiguous, the court is not at liberty to revise a contract under the guise of construing it or to rewrite the contract that the parties entered into. *General American Indemnity Company v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *Stahl Petroleum Co. v. Phillips Petroleum Co.,* 550 S.W.2d 360, 366 (Tex.Civ.App.—Amarillo 1977), *aff'd,* 569 S.W.2d 480 (Tex.1978).

■ As LEC correctly points out, it was contractually bound to install and maintain appropriate measuring equipment to accurately measure the gas delivered to the point of delivery at the REO–Barnhill compressor station. However, there is no provision in any of the contracts stipulating that in the event of a dispute over the amount of gas delivered by Trans–Pan, the measurements by LEC would be conclusive for the purpose of resolving the dispute. The trial court rejected LEC's request for the factual finding that the contracts provide its measurement equipment shall control the measurement and payment for casinghead gas delivered by Trans–Pan and provide the method for resolving measurement disputes. That the parties did not so intend by the contractual language they chose, as determined by the court's rejection when called upon to resolve the disputed facts, is justified by other features of the contracts.

The contracts provided for periodic testing, verification, and correction of LEC's measurements, with advance notice of the testings to Trans–Pan so the testings could be observed. Trans–Pan also was permitted to install measuring equipment at the point of delivery to check on the accuracy of LEC's measurements, albeit Trans–Pan did not exercise the option. By these provisions, and the absence of a provision for the resolution of measurement disputes, the court reasonably could conclude that the parties recognized the inconclusiveness of LEC's measurements; otherwise, no rea-

son existed to specify the testing, verification, and correction if LEC's measurements were conclusive of any dispute about gas delivered.

■ Although the contractual obligation of LEC for measurement of the gas delivered was unambiguous, the obligation imposed was not expressed as controlling any dispute concerning the measurements. In the absence of a provision for resolving the dispute in this cause, one will not be implied. *Black v. Acers,* 178 S.W.2d 152, 154 (Tex.Civ.App.—Dallas 1944, writ ref'd). Consequently, the trial court cannot be charged with an unauthorized disregard of a contractual method for measuring the gas and resolving disputes.

Next, LEC attacks, by the use of legal and factual insufficiency evidence points, the evidential support for the factual findings, upon which Trans–Pan had the burden of proof, of the inaccuracy of LEC's measurements, the accuracy of Trans–Pan's measurements, and the proof of damages. Included within the attacks are related points by which LEC challenges the admission of Edwards' testimony of damages.

To sustain its legal insufficiency or "no evidence" points, LEC must demonstrate that there is a complete absence of admissible, probative evidence of the facts found. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 363–64 (1960). To sustain its factual insufficiency or "insufficient evidence" points, LEC must demonstrate that the evidence in support of the facts found is so weak, or that the contrary evidence is so overwhelming, that the findings should be set aside. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

In support of its evidential points, LEC directs attention to the evidence showing that it installed, maintained, and operated measurement equipment described as "state of the art" and "best in the industry," which met all of the American Society of Mechanical Engineers standards. For testing the BTU content, LEC installed Welker composite samplers, said to be accurate and reliable, which initially collected a sample every fifteen minutes for a thirty-day period and later were set to collect a sample every seven and one-half minutes over a fifteen-day period. Furthermore, LEC gave Trans–Pan notice of meter tests so Trans–Pan could verify the accuracy of the metering, and furnished Trans–Pan and their consultant monthly reports on which LEC's payments to Trans–Pan were made. The reports integrated the point of delivery meter charts and gas sample chromatograph analyses, which neither Trans–Pan nor their consultant ever questioned or made objection. In fact, LEC says, Trans–Pan did not present any evidence that LEC ever failed to measure Trans–Pan's gas or that adjustments due to meter error were ever required.

Only opposed to this evidence, LEC submits, was Trans–Pan's evidence consisting, in LEC's view, of Trans–Pan's own gas volume statements taken from individual lease meters scattered throughout the forty miles of the gathering system pipeline. However, a number of the meters were Invalco meters which, so Trans–Pan's engineer had complained in a letter, were inaccurate and "usually on the high side." Between these meters and LEC's meters were drips, scrubbers, slug catchers, frac tanks that vented to the atmosphere, fuel consumption by Trans–Pan's compressors, and pop valves, together with a build up of "black stuff" on the meters that may have created inaccurate readings on the meters.

Further, in contrast to LEC's testing for BTU content, Trans–Pan used random spot samples, arbitrarily selecting a 3 July 1984 spot sample of BTU content to pay its producers for the time frame of November, 1984 through March, 1985, while using other samples of a higher BTU content to calculate unaccounted-for gas and liquids damages. With reference to the random samples testified to by Edwards, LEC indicates evidence showing that although Edwards, who did not have any dispute with LEC's payments for certain months, initially testified that the June, 1984 damage calculation was based on a June sample, it was later determined that the June, 1984 damage was based on an average of ran-

dom spot samples taken during the months of November, 1984 through March, 1985, though admittedly a different stream of gas was flowing during the two periods of time. A calculation by Don McGee, Mitchell Energy Corporation's Manager of Operations Analysis, using Trans–Pan's samples and calculation method for every month, revealed that Trans–Pan would owe LEC a net of $53,088 for overpayment.

Notwithstanding LEC's evidential presentation, there was, so Trans–Pan recounts, other evidence for consideration by the court. LEC installed a single line with one meter to measure the gas deliveries by both Trans–Pan organizations, resulting in a commingling of the deliveries and accounting problems. On its side of the delivery point, LEC installed and controlled a pressure or "pop-off" valve, designed to open and vent gas into the atmosphere when pressure exceeded a certain point. Frequently, the pop-off valve vented into the atmosphere significant gas after it had crossed the delivery point but before it reached LEC's measuring meter. LEC also installed a scrubber and condensate storage tank downstream from the delivery point and upstream from its meter, giving rise to significant BTUs being bled off from Trans–Pan's gas stream before measurement by LEC. And prior to late February of 1985, LEC neglected to notify Trans–Pan of any testing of its metering facilities.

Additionally, testimony and exhibits were introduced indicating that on numerous occasions, LEC's samplers and equipment were inadequately maintained which, coupled with the alignment of LEC's equipment, resulted in inaccurate metering of Trans–Pan's and other suppliers' gas deliveries. The Welker gas samplers, which measure BTUs, had not been functioning properly. LEC's internal memoranda revealed lack of notice to Trans–Pan of meter testing, substantial measurement problems, a leak in mid-June and a blow-out in August, an inability to prevent gas losses and unexplained losses, and a "large gas imbalance" at the REO–Barnhill compressor station.

Edwards testified that because of the deficiencies in LEC's measuring and his belief that a correct accounting had not been received from LEC, he had calculated that Trans–Pan lost profits of $947,717.10 as a result of LEC's failure to adequately measure and account for both volumes and BTUs of gas delivered. LEC unsuccessfully sought the striking of the global conclusion until the underlying records are presented and the method of calculation is shown.

Later, during cross-examination, Edwards explained how he arrived at the $947,717.10 figure. Unable to witness LEC's samples, he took the samples available from Trans–Pan's lines as shown in the production of documents for the trial, and multiplied the gallons of each segregated component of the gas revealed in the samples by a formula to arrive at the theoretical value of the gas delivered. In this regard, Edwards noted that the formula was a theoretical value agreed upon with LEC in September, 1984 when LEC realized that it was not capable of keeping track of the product by the actual method called for in the contract and admitted owing additional money.

After Edwards calculated the theoretical value of the amount of gas Trans–Pan delivered in a particular monthly period, he referred to the LEC statement for the same period of time for the calculated amount of gas shown recovered under the theoretical calculation of LEC's sample. He then subtracted LEC's calculation from his calculation to ascertain the gas unaccounted for by LEC for the period, and computed eighty percent, the producer's share, of the difference as the additional amount due Trans–Pan. Edwards made the calculations for production from June, 1984 through July, 1985 to arrive at the total of $947,717.10.

At this point, it is appropriate to notice that LEC represents that if Edwards' testimony of the monthly amounts is accepted notwithstanding the contract provisions, the damages are $476,775.62 instead of $947,717.10 as found and awarded by the trial court. To the contrary, the damages the trial court found, consistent with Ed-

wards' testimony, that had accrued to Trans–Pan for each period, as listed separately in the court's finding of fact no. 47, totals exactly $947,717.10.

■ LEC also assigns to the $947,717.10 award an area of speculation in that the amount is awarded to both Trans–Pan organizations without evidence of each entity's individual alleged damage. In raising the speculation, LEC notices that the record reveals a dispute whether allocation of damages was prevented because LEC joined Trans–Pan's gas lines before the delivery point and commingled the gas streams, as Edwards testified, or Trans–Pan provided only one line, as Trans–Pan's construction overseer testified, and mentions that the contracts provided for a commingled gas stream with allocation by LEC. However, these matters are of no moment, for if LEC is liable for $947,717.10 in damages in some apportionment to the two Trans–Pan organizations, LEC has no interest in the apportionment between them, *Texas & N.O. Ry. Co. v. Stevens*, 24 S.W.2d 9, 10 (Tex.Comm'n App.1930, holding approved), and, therefore, is without standing to complain of a matter that only affects the two Trans–Pan organizations. *Shell Petroleum Corporation v. Grays*, 131 Tex. 515, 114 S.W.2d 869, 870 (1938).

■ This situation serves to negate LEC's complaint that the court failed to find its proposed additional finding of fact that the two Trans–Pan organizations commingled gas prior to delivery. And no more pertinent is LEC's additional complaint that the court failed to find its proposed additional finding of fact that Trans–Pan approved the design and installation of the equipment at the REO–Barnhill delivery point. The latter requested factual finding pertained only to a mere evidentiary matter on which the court was not required to make a finding; it was not the equivalent of an ultimate or controlling issue on which the court was required to make a finding. *Flagg Realtors, Inc. v. Harvel*, 509 S.W.2d 885, 893 (Tex.Civ.App. —Amarillo 1974, writ ref'd n.r.e.).

Mentioned earlier was LEC's unsuccessful attempt to exclude Edwards' testimony of the $947,717.10 damage amount until the underlying records were presented and the method of calculation was shown. LEC now asserts that its objection referred to its earlier objection when Edwards, attempted to be qualified as an expert, was allowed, without disclosing the underlying data, to give his summary testimony of lost profits, and to introduce a chart of the summary, under Rule 705, Texas Rules of Civil Evidence. At that time, the tenor of the objection was that Edwards was testifying to lost profits as a lay witness, and his testimony was inadmissible without the underlying records at least being made available to the court. LEC still insists that although Edwards apparently was qualified as an expert in petroleum engineering, he was testifying as a lay witness to the $947,717.10 figure, and it was error to admit his summary under rule 705 without disclosing the underlying records. The court further erred, LEC also insists, because the predicate required by Rule 1006, Texas Rules of Civil Evidence, for admission of a summary was not met.

■ Although it is almost impossible to prescribe exact qualifications for one to be an expert, 2 R. Ray, Texas Law of Evidence Civil and Criminal § 1401 (Texas Practice 3d ed. 1980), one may qualify as an expert "by knowledge, skill, experience, training, or education." Tex.R.Civ.Evid. 702. Whether one offered as an expert possesses the required qualifications is a preliminary question for the trial court's determination, which will not be disturbed in the absence of a clear abuse of discretion. *Stanley v. Southern Pacific Company*, 466 S.W.2d 548, 551 (Tex.1971); *Storm Associates, Inc. v. Texaco, Inc.*, 645 S.W.2d 579, 589 (Tex.App.—San Antonio 1982), *aff'd sub nom. Friedman v. Texaco, Inc.*, 691 S.W.2d 586 (Tex.1985).

■ Preliminarily to offering the testimony of Edwards, the chairman of the board, president, and majority stockholder of Trans–Pan Gathering, Inc., it was shown that in 1970, he received a degree in petroleum engineering from the University of Texas in Austin, later had seminar and course trainings in different types of exper-

tise involving petroleum engineering, and was licensed in Texas as a professional engineer in 1976. Following his university graduation, he was employed by two major oil companies as a petroleum engineer, charged with the responsibilities of drilling and completing wells, working them over, making AFE proposals, and writing reports concerning reservoir and production engineering. Afterwards, he worked for independent oil companies where he performed similar duties with increased management responsibilities.

Later, Edwards worked for a major bank as a petroleum engineer and for a reservoir consulting firm. He made numerous written evaluations of leases. For Brady, Texas, he performed a complete gas study and projection, which entailed analyzing and estimating the reserves, projecting future gas needs, and making recommendations of future operations and procedures.

Beginning in 1972, he worked throughout the Texas Panhandle for an oil company. He organized an engineering company for petroleum engineering consultation work. He successfully drilled an oil well for a company.

In 1976, Edwards began acquiring oil and gas leases in the Texas Panhandle. He formed drilling ventures for which he prepared prospectus, evaluation, economic, and financial reports. Then he drilled and completed wells, connected them to tanks and pipelines, negotiated gas contracts, and made all Texas Railroad Commission filings.

Edwards formed Trans–Pan REO Industries and Trans–Pan Gathering, Inc. in late 1981 and early 1982, building a gathering system for gathering gas from a number of wells. He entered into a gas processing agreement with Diamond Shamrock Corporation and, in 1984, he entered into the original gas processing and gas purchase contracts with LEC. In the management of Trans–Pan Gathering, Inc., Edwards oversees the engineering and reviews all of the completion, reserve and delivery information pertaining to all of the wells connected to the pipeline, which gives him an in-depth knowledge of the reservoir and production conditions.

█ Given the recitation of Edwards' formal education with practical application, his actual experience in production and marketing, his ability of evaluation, and his managerial experience in all phases of the operations, it cannot reasonably be said that the trial court abused its discretion in accepting him as an expert in the areas of locating, producing, marketing, and evaluating petroleum products. Once qualified as an expert, Edwards could express an opinion based on his specialized knowledge to assist the trial court in understanding the evidence and determining issues of fact. Tex.R.Civ.Evid. 702.

█ It, then, does not avail LEC to contend that Edwards was allowed to give his summary testimony of lost profits without disclosing the underlying data; he could give his expert opinion without including the predicative data, since the court did not require it. Tex.R.Civ.Evid. 705. Nevertheless, LEC was entitled to the disclosure of the supporting data for Edwards' opinion on cross-examination, *id.*, and it is apparent from the extensive and detailed cross-examination that LEC exercised its entitlement.

No more available is LEC's further contention that the court erred in admitting the testimony of the $947,717.10 figure and the chart containing the summary because the predicate required by Rule 1006, Texas Rules of Civil Evidence, was not met. To support its contention of the missing predicate for the summary evidence—*i.e.*, that the originals or duplicates of records, which are so voluminous that they cannot conveniently be examined in court, shall be made available at a reasonable time and place, or ordered produced in court—LEC makes reference to the record where it requested the court to order delivery of records for prescribed months. Thereafter, the court ordered the records produced, and LEC does not suggest Trans–Pan's disobedience of the court's production order.

If, indeed, there was a lack of supportive data, it would tend to diminish the reliability of Edwards' testimony, but the lack of data affects the weight and not the admissibility of his testimony. LEC was free to challenge Edwards' testimony by critical cross-examination, as it did and extensively so, and Edwards' competency was open to challenge. Yet, it cannot be said that the cross-examination negated the probative force of Edwards' testimony; the effect was for the trial court as the trier of fact. *Texas Elec. Service Co. v. Wheeler*, 551 S.W.2d 341, 342–43 (Tex.1977).

Obviously the trial court was faced with conflicting and contradictory evidence presenting several alternatives. The court, given considerable discretion in evaluating the evidence, necessarily judged the credibility of the witnesses and the weight to be given their testimony. In doing so, the court could believe any one witness and disbelieve other witnesses, resolve inconsistencies in the testimony of any witness as well as in the testimony of different witnesses, and arrive at the facts deemed most reasonable under the evidence. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

Accordingly, LEC has not demonstrated a complete absence of admissible, probative evidence in support of the factual findings for the $947,717.10 award. Nor has LEC demonstrated that the evidence in support of the factual findings is so weak, or the contrary evidence is so overwhelming, that the factual findings should be set aside.

### b. Prejudgment Interest

The sustention of the damage award effectively disposes of LEC's contention that the prejudgment award of $90,641.82 was calculated on an erroneous amount of damages. There remains the final contention in this series of points that the applicable rate is six percent as provided in article 5069–1.03, Texas Revised Civil Statutes Annotated (Vernon 1987), rather than the ten percent rate used by the trial court.

Trans–Pan pleaded for prejudgment interest at the highest rate allowed by law. Although it may be said that the original contracts provide the conditions upon which liability depends, the contracts, containing myriad conditions respecting the quality of gas, do not provide a measure by which the sum payable can be ascertained with reasonable certainty. Therefore, the court correctly applied the maximum legal rate of prejudgment interest. *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930–31 (Tex.1988).

Each facet of LEC's first sixteen points of error has been considered, whether specifically mentioned or not, and no reason appears therein to disturb the judgment. The points are overruled.

### 3. Supplemental Agreements and Damages for Underpayment

As earlier outlined in the forepart of this opinion, LEC and Trans–Pan executed supplemental agreements on 1 May 1985, which, so the trial court found, was an effort by the parties to compromise and settle the controversy between them. The consideration flowing to Trans–Pan for the execution of the agreements, the court wrote, was the agreement of LEC to comply with its pre-existing contractual obligations. However, the court further found, LEC breached the supplemental agreements at their inception by continuing to refuse to accept, process, and pay for all of Trans–Pan's deliverable gas, and incorrectly accounted for volumes of gas delivered. Also, the court found that LEC repudiated the agreements by refusing to honor its obligations by refusing, in short, to install and operate its equipment so as to accept, process, and pay with proper documentation 100% of Trans–Pan's deliverable gas.

Continuing with its findings, the court expressed that LEC breached the 4 September 1985 agreement of the parties, contractually entered into by LEC and Trans–Pan and incorporated into the court's 18 September 1985 order, by refusing to accept, measure, process, and pay for all of Trans–Pan's deliverable gas, and by paying prices

considerably less than the amount actually owed Trans–Pan. LEC's breach, the court found, proximately caused damage to Trans–Pan in stated monthly amounts from 31 August through 31 October 1985 in the total amount of $484,561, for which Trans–Pan was entitled to equitable damages in the form of prejudgment interest in the amount of $21,150.33. These amounts were included in Trans–Pan's recovery in the court's judgment.

These determinations by the court are attacked by LEC with its grouped points of error seventeen through thirty-eight. The attack is predicated, in the main, on a multitude of legal and factual insufficient evidence contentions, matter of law contentions, and contentions of deficiencies in Trans–Pan's pleadings.

### a. Supplemental Agreements

As a threshold consideration, it is to be observed that both LEC and Trans–Pan view the court's findings respecting the supplemental agreements as a determination that the agreements are void. However, the court did not, either in its specific factual findings or in its legal conclusions drawn therefrom, definitively express that the supplemental agreements are void.

From a casual reading, the factual findings reasonably could be construed as a determination either that the agreements are void because of the absence of sufficient consideration, or that LEC, by its breach and repudiation, merely defaulted in the obligations imposed on it by the agreements. Because the construction of the court's findings reasonably lead to different conclusions, they must be construed, if possible, in harmony with the court's judgment and to support it. *Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299, 301 (Tex. 1963).

In seeking to construe the findings in harmony with the judgment, an apparent anomaly emerges. In its judgment, the court declared "that, under the parties' contracts, [LEC] is entitled to discontinue operation of its Canadian River Gas Processing Plant and related facilities on November 1, 1985." The only contracts of the parties for the November closing date are the supplemental agreements. From this, the court's findings would support a determination that the supplemental agreements were subsisting agreements.

However, in the same judgment, the court also declared "that, under the parties' contracts, the purchase price for all gas delivered by [Trans–Pan] for processing and/or purchase by [LEC], from the inception of the Gas Processing and Purchase Agreements dated June 15, 1984 to the date of this Judgment, shall be at the price set out in the June 15, 1984 Gas Processing and Purchase Agreements." The judgmental declaration itself evinces that the court determined, on the strength of its findings, that the substituted pricing formula for gas delivered set out in the supplemental agreements was without effect. Yet, it does not escape notice that in contradiction of the declaration, the court based its award of $947,717.10 for damages accruing through July of 1985 not on the price in the 1984 original contracts, but on testimony of damages calculated under the substituted theoretical accounting method agreed upon by the parties subsequent to the execution of the original contracts and specified as the pricing formula in the supplemental agreements.

Nevertheless, the apparent anomaly is solved by a studied appraisal of the findings respecting the supplemental agreements in connection with other pertinent findings. The correct appraisal of the findings reveals that the court fashioned its findings in harmony with and in support of the judgment it rendered without an overt expression on the verity of the supplemental agreements, but upon the determination that the theoretical accounting method for gas delivered as specified in the agreements had been superseded by the original contract price as fixed in the 18 September 1985 agreed order.

The determination is fully evinced by three factors. First, in its findings numbered 46, 47, and 55, the court based its award of $947,717.10 and 10% attorney's fee explicitly on the breach of both the original contracts and the supplemental

agreements. Had the court considered the supplemental agreements void *ab initio*, they would not have been subject to breach. [

Second, in its findings numbered 48 through 52, the court refers to the September, 1985 contractual agreement of the parties, notes its incorporation into the 18 September 1985 written order, and sets out LEC's breach of that agreement, which proximately caused damages to Trans–Pan in the amount of $484,561 that accrued in stated monthly sums on the last day of August, September, and October, 1985.

Third, the amount of $484,561 is founded only on testimony demonstrating the court's disregard of the pricing formula in the supplemental agreements in favor of the original contract price reinstated by the September, 1985 agreed order. The testimony was adduced from an LEC employee at the 30 January 1986 hearing on Trans–Pan's motion to hold LEC in contempt for disobeying the court's 18 September 1985 order. The tenor of the testimony is exemplified by these excerpts:

A. Yes. What that [accounting information] tells us is that if we had used the June 15th, '84 agreements without reference to the May 1st supplemental agreement that there would be an additional amount of $484,561.00 to be paid to Trans–Pan.

\* \* \* \* \* \*

Q. Now, in addition to those [escrowed] funds [for the months of August, September, and October, 1985], would it be accurate to say that under your calculations that had LEC paid Trans–Pan pursuant to the pricing formulas set forth in the June 1984 agreement, it would have paid $484,561 more than it actually paid? Isn't that what your summary shows?

A. That's what it shows.

Then, in accord with the determination correctly flowing from the findings, any further discussion of the parties' competing contentions of the valid vis-a-vis void nature of the supplemental agreements should be rendered moot.

Still, LEC urges the verity of the supplemental agreements as a matter of law and for a lack of a supportable evidential basis to hold otherwise. Additionally, LEC argues that the only matters before the court on 4 September 1985 were its motions for continuance and Trans–Pan's motion to convert the temporary restraining order into a temporary injunction, to which LEC agreed. Therefore, LEC opines, the court was not empowered to void the supplemental agreements by its order, an interpretation it was not informed about until ten days later.

■ In its advocacy, LEC overlooks the force of the September, 1985 order to which it expressly agreed. The same rules that apply to a court's judgment apply to a court's order. *Lone Star Cement Corporation v. Fair,* 467 S.W.2d 402, 404–05 (Tex.1971). Thus, the order consented to by the parties in the pending cause did not require pleadings to support it. *Mullins v. Thomas,* 136 Tex. 215, 150 S.W.2d 83, 84 (1941). And not only was the agreed order contractual in nature, but it was mandatory and imposed upon LEC the obligation to pay the 1984 original contract price for the gas that Trans–Pan delivered. *Wagner v. Warnasch,* 156 Tex. 334, 295 S.W.2d 890, 893 (1956). The order offered LEC the opportunity to notify the court of its inability to comply with it, but LEC does not suggest that it availed itself of the opportunity after it learned of the interpretation being placed on the order.

#### b. $484,561 Damage Award

The testimony quoted above negates LEC's challenge to the evidential support for the court's findings of a breach of the September, 1985 contractual agreement and for the $484,561 award unless, as LEC contends, there is another bar to the award. The bar raised by LEC is, in essence, that the matters were not properly before the court for judgment.

■ In this regard, LEC asserts that the trial was concluded on 10 October 1985 and the court advised counsel of its ruling regarding damages by its 31 December 1985 letter. The evidence of the $484,561

underpayment was introduced at the 30 January 1985 hearing on Trans–Pan's motion for contempt, but thereafter the court by its 24 March 1986 letter denied Trans–Pan's previously-heard motion to reopen evidence. Consequently, LEC submits, the court was without jurisdiction to render the judgment for $484,561 plus $31,150.33 prejudgment interest because there were no pleadings by Trans–Pan to support the award and the evidence thereon was not heard during the trial of the cause itself.

In its live trial pleadings, Trans–Pan, alleging that the supplemental agreements were void either as a result of LEC's breach or because of want of consideration, pleaded for recovery for gas delivered at the original contract price. In its combined motions to reopen evidence or grant a new trial and to hold LEC in contempt, Trans–Pan, alleging that the court recognized the original contract price prevailed, pleaded for recovery of amounts due for gas delivered at the original contract price additional to the $947,717.10 award announced by the court in its December, 1985 letter. At the time evidence was adduced of the $484,-561 underpayment, the court had made no ruling on the motion to reopen evidence.

The office of pleadings is to impart fair and adequate notice of the facts upon which the pleader bases the claim made in order that the opposing party is enabled to prepare a defense. *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). On balance, Trans–Pan's pleadings were sufficient to give fair notice that LEC would have to defend against a claim that all gas actually delivered had not been paid for at the original contract price.

It is a correct recitation of the record that the court notified the parties by its 24 March 1986 letter that Trans–Pan's motion to reopen evidence and for contempt should be denied, and later on 1 May 1986 rendered judgment awarding Trans–Pan $484,561 based on evidence adduced during the hearings on Trans–Pan's motions. It is also a correct recitation that in its letter, the court requested the preparation of an order in accordance therewith, but a signed order to that effect is not in the appellate record. Instead, the court prefaced the decretal portion of its judgment with recitations of hearing evidence and argument on Trans–Pan's motion, with consideration of post-hearing briefs, and a finding that its judgment should resolve all matters in controversy, including Trans–Pan's motions. In this respect, the court was authorized to permit additional evidence to be offered at any time when it clearly appears necessary to the due administration of justice. Tex.R.Civ.P. 270.

Then it must be accepted that when the court rendered its final judgment, it was the final consideration and determination of all matters submitted, including Trans–Pan's motions. This acceptance is particularly applicable because the final judgment, unambiguous and harmonious in its terms, speaks for itself and may not be impeached by or interpreted in the light of the court's prior statements or acts. Thus, whatever the court indicated about an interlocutory order, it can neither control nor modify the particular and express adjudication unambiguously made in the court's judgment. *Harrison v. Manvel Oil Co.,* 142 Tex. 669, 180 S.W.2d 909, 914–17 (1944). Moreover, it cannot be doubted that the court permitted the reopening for additional evidence since the court did not honor LEC's post-judgment motion to modify the judgment in this respect.

Accordingly, no facet of LEC's points of error numbered seventeen through thirty-eight is a reason to alter the judgment rendered. All of the points are overruled.

### 4. Nitrogen Quality Specification

At the anterior portion of this opinion, mention was made of the original contract provision obligating LEC to accept delivery of Trans–Pan's gas only if certain minimum standards were met, one of which was that the gas contain no more than three (3%) percent nitrogen. In rendering its judgment, the court included a finding and a declaration concerning the nitrogen quality specification. The court found that LEC's 21 March 1985 letter to Trans–Pan advising that LEC would not accept delivery of gas containing in excess of three

(3%) percent nitrogen was a reasonable retraction of LEC's previous waiver of the nitrogen quality specification. The court then declared that LEC has the right to insist upon the quality specifications as set forth in the original contracts.

By way of amplification, the court incorporated in its findings of fact several predicates. The court found, in summary, that all casinghead gas produced from the Panhandle Field has a nitrogen content in excess of three (3%) percent, and that there is no commercially reasonable method to reduce the nitrogen content of gas below three percent; that an excess nitrogen content does not affect the quality of the gas, but merely impacts on the heating value or BTU content of the gas; that LEC never complained of the BTU content nor rejected delivery of Trans–Pan's gas because of the nitrogen content; that until 21 March 1985, LEC intentionally and knowingly relinquished its right, by express representations, to require that Trans–Pan comply with the nitrogen content requirement; and that LEC's 21 March 1985 letter was a retraction of LEC's previous waiver of the nitrogen quality specification.

Only concurring with the court's finding that the gas quality specifications are enforceable, LEC utilizes its points of error numbered thirty-nine through fifty-eight to challenge all findings and portions of the judgment that hold or imply it waived any of the quality specifications. Notwithstanding the particularized challenge, an address of each distinct complaint has been foreclosed for two main reasons.

■ As previously stated, LEC expressly agreed to, and thereby became bound by, the court's 18 September 1985 order. By that agreed order, LEC bound itself to accept and purchase *all* casinghead gas Trans–Pan is capable of delivering. At that point, the order operated to end any controversy concerning the nitrogen quality specification. *Wagner v. Warnasch,* 295 S.W.2d at 893.

■ Beyond that, the final judgment declared LEC's right to insist upon the quality of gas specified in the original contracts, and conditioned LEC's obligation to accept Trans–Pan's gas to that which "meets quality specifications" of the original contracts. LEC has not suggested how it is harmed by the court's holding or implication that it previously waived any of the quality specifications, or how a favorable determination of its points would affect the binding force of the judgment rendered. As a fundamental matter, questions unnecessary to a proper disposition of an appeal are not addressed. *Cornell & Co. v. Pace,* 703 S.W.2d 398, 404 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.); *Mooneyhan v. Benedict,* 284 S.W.2d 741, 745 (Tex.Civ.App.—Austin 1955, writ ref'd n.r.e.). Points numbered thirty-nine through fifty-eight are overruled.

### 5. Capacity to Deliver and Accept Gas

Included among the court's findings of fact are findings that LEC, with the contractual obligation to install equipment necessary to accept 100% of the casinghead gas Trans–Pan could deliver, provided line capability only sufficient to accept 20 million of the maximum 40 million cubic feet of gas available for delivery each day. With the fifty-ninth through sixty-seventh of its points of error, LEC, faulting the evidential bases for the findings and proposing other propositions of error, seeks a correction of the court's findings to reflect that it always had the capacity to accept all of Trans–Pan's deliverable casinghead gas. However, LEC only argues the evidential aspects of the points, to which consideration will be given.

The thrust of LEC's argument is that the global conclusional testimony by Edwards of its incapacity to accept all gas deliverable must yield to that of the highly qualified experts, who clearly proved the fallacy of Trans–Pan's contentions. In this regard, LEC submits that it was manifestly unjust for the court to allow Edwards' global and conclusional testimony over its objection and without the underlying records being available and introduced into evidence. It suffices to respond that this submission was considered and decided adverse to LEC's position in the address to

the first sixteen points of error, and it will not be elaborated upon here.

There can be no doubt that the evidence bearing on Trans–Pan's ability to deliver gas and LEC's ability to accept the gas delivered was conflicting and contradictory. One version was presented by Edwards, Greg Sargent, Trans–Pan's engineer, Ronald Miller, a vice-president of an unrelated gas gathering company, and Donald K. Reinhardt, an Ingersoll Rand engineer charged with marketing compressor packages of the type used both by LEC and Trans–Pan. In brief, the evidence, including reference to LEC's documents and an admission, was that Trans–Pan had available for delivery 8 to 40 million cubic feet of gas per day, but the LEC, albeit with unutilized means to accept additional gas, had an actual acceptance capacity of only 20 million cubic feet each day, and was incapable of accepting all of the gas deliverable by Trans–Pan.

Another version was advanced by Dan Jones, a registered professional engineer, and Ray Solis, the engineer who designed the pipeline from the REO–Barnhill delivery point to the Canadian River Gas Processing Plant, together with excerpts from the testimony of Trans–Pan's witnesses. Again in brief, the evidence, aided by reference to various production and meter reports, was that Trans–Pan actually had available for delivery on a continual basis only 14 million cubic feet of gas per day, and LEC had a capacity to accept 28.8 million cubic feet of gas daily, which could be expanded to a daily capacity of 40.99 million cubic feet.

The conflicting and contradictory testimony of the interested witnesses and experts merely raised issues of fact. It was the province of the trial court, as the judge of the credibility of the witnesses and the weight to be given their testimony, to resolve the conflicts and contradictions in their testimony in order to determine the facts. *McGalliard v. Kuhlmann,* 722 S.W.2d at 697. Within the evidence heard by the trial court is some evidence of probative force to support each of the court's findings; and, after a review of all the evidence, it cannot reasonably be said that the evidence supporting each finding is so weak, or the contrary evidence is so overwhelming, that the findings should be set aside. Points numbered fifty-nine through sixty-seven are overruled.

In drawing its conclusions of law, the court concluded in the eighth one that the damages suffered by Trans–Pan and Edwards for increased cost of credit with their lenders in the amount of $640,000 are consequential damages and are not recoverable under Texas law. LEC contends, with its points of error sixty-eight through seventy, that the conclusion is erroneous because of the lack of pleadings and evidence to support it.

It is unnecessary to decide the contentions, for a decision would not affect the judgment to be rendered on appeal. *City of Dallas v. Tex. Water Rights Com'n,* 674 S.W.2d 900, 903 (Tex.App.—Austin 1984, writ ref'd n.r.e.). Points of error sixty-eight through seventy are overruled.

### 7. Upstream Removal of Hydrocarbons

In the original contracts, Trans–Pan agreed not to remove, or allow to be removed, liquid hydrocarbons from the gas stream by processing such gas upstream without the written consent of LEC. Contemporaneously therewith, it was provided that: "Field separation approved by the Railroad Commission for the Panhandle field area shall not be considered upstream processing for purposes of this paragraph."

LEC counterclaimed for Trans–Pan's breach of this obligation. The court found that Trans–Pan fully performed its covenants and obligations, and that Trans–Pan had not removed or allowed to be removed liquid hydrocarbons from its gas stream by processing operations upstream. In its judgment, the court ordered that LEC take nothing by its counterclaim.

By the use of its points of error seventy-one through seventy-four, LEC attacks the evidential support for the findings underpinning the take-nothing judgment. Although LEC drafted its points as both no evidence and factually insufficient evidence

points, the only argument it presents is that it conclusively established its right to rendition of judgment for $19,261.95 for excess liquids removed by Trans–Pan's producers, and for $108,360.66 for liquids removed by Trans–Pan.

To support its argument, LEC relies upon the testimony of Edwards that liquids were removed, with substantiation by contracts between Trans–Pan and producers, and exhibits for the calculations of the values of the liquids removed. Edwards also testified that Trans–Pan does not do any processing, and that any liquids that fall out before the producers' gas reaches Trans–Pan's pipeline is not considered processing by the Railroad Commission.

■■■ It was, of course, within the discretion of the court to credit Edwards' testimony that liquids were not removed by processing over his testimony that liquids were removed. *McGalliard v. Kuhlmann*, 722 S.W.2d at 697. Points seventy-one through seventy-four are overruled.

## 8. Loss of Reserves

The court found that Trans–Pan was unable to contract with other producers because of LEC's breach of the contracts, and concluded that Trans–Pan's loss of reserves are consequential damages that are not compensable. By its judgment, the court denied all relief requested that was not expressly granted.

LEC assigns, with its points seventy-five through seventy-nine, error to the court's rulings. The purpose of the assignment, predicated on evidential grounds and a mischaracterization of the type of damages, is, as LEC states, to correct the findings and conclusions to reflect that Trans–Pan failed to prove any recoverable damages.

Again, it is unnecessary to decide, or comment on the merits of, the assignment of errors which will not affect the judgment to be rendered on appeal. *City of Dallas v. Tex. Water Rights Com'n*, 674 S.W.2d at 903. The group of points is overruled.

## 9. Notice of Discontinuance of Operations

In three findings of fact, the court found, in effect, that the only notice LEC gave of the discontinuance of operations at the Canadian River Gas Processing Plant, as required by the original contracts, was in the supplemental agreements. LEC drafted its last group of points, numbered eighty through eighty-three to request that on evidential grounds, the findings be corrected to reflect the notices established by the record. For the same reason expressed to overrule the preceding group of points, the points of error are overruled.

## 10. Trans–Pan's Cross-points

Trans–Pan has advanced on appeal seven cross-points of error. It faults the court for not making a requested finding concerning the amount of damages it suffered in the form of lost reserves and lost gas contracts, and in failing to award damages therefor; for failing to render judgment in the amount of $640,000 for loss of credit; in failing to award attorney's fees for recovery of injunctive relief and damages for breach of the September, 1985 agreement; in declaring that LEC has the right to insist upon the quality specifications for gas delivered; and in finding that LEC's 21 March 1985 letter was a reasonable retraction of its previous waiver of the nitrogen specification. In the event additional damages are awarded under its cross-points, Trans–Pan also seeks a reformation of the judgment to award additional attorney's fees.

The cross-points are not viable. Although Trans–Pan did seek a postjudgment finding of the amount of damages it suffered for the reserves the court concluded it lost, Trans–Pan made no complaint of the omission of these damages from the judgment, nor did it complain of the judgment rendered in any other respect until it filed its brief on appeal.

■■■ If Trans–Pan was dissatisfied with the judgment rendered for the reasons now advanced by cross-points on appeal, it had the duty to first bring the matters to the attention of the trial court. Because

Trans–Pan did not do so, it may not now be heard to complain of the matters first raised by its cross-points. *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866, 881 (Tex.1968); *West Texas Utilities Company v. Irvin,* 161 Tex. 5, 336 S.W.2d 609, 611 (1960). The cross-points are overruled.

The judgment is affirmed.